1

1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,       : 09-CR-00003(CBA)
4                                :
                                 :
5                                :
        -against-                : United States Courthouse
6                                : Brooklyn, New York
                                 :
7                                :
                                 : Wednesday, June 17, 2009
8 DARIEN PUGHE                   : 9:30 a.m.
  and DEWAYNE TAYLOR,            :
9                                :
          Defendant.             :
10
    - - - - - - - - - - - - - - X
11

12          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE CAROL BAGLEY AMON
13                 UNITED STATES DISTRICT JUDGE

14
                    A P P E A R A N C E S:
15
For the Government: BENTON J. CAMPBELL, ESQ.
16                      United States Attorney
                    Eastern District of New York
17                      271 Cadman Plaza East
                        Brooklyn, New York 11201
18                  BY:  MATTHEW S. AMATRUDA, ESQ.
                        Assistant United States Attorney
19

20
For the Defendant:    ROTHMAN, SCHNEIDER, SOLOWAY & STERN, P.C.
21                      100 Lafayette Street
                        Suite 501
22                      New York, New York 10013
                    BY:DAVID STERN, ESQ.
23

24

25

2

For the Defendant:     FEDERAL DEFENDER OF NEW YORK
                       16 Court Street
                       3rd Floor
                       Brooklyn, New York  11201
                    BY:LEN H. KAMDANG, ESQ.
                       AMANDA ROHRKEMPER, Intern




**A L S O   P R E S E N T**



AGENT THOMAS McNALLY


MARY-ANNA PRINCIPE








Court Reporter:  Victoria A. Torres Butler, CRR
                 Official Court Reporter
                   Telephone: (718) 613-2607
                   Facsimile: (718) 613-2324
                   E-mail:    VButlerRPR@aol.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

```
                         Proceedings                      3
```

1            (In open court.)

2            (The following occurs outside the presence of the

3    jury.)

4            THE COURTROOM DEPUTY:  All rise.

5            The United States against Pughe and Taylor.

6            Counsel, please state your appearances for the

7    record.

8            MR. AMATRUDA:  Matthew Amatruda for the United

9    States.

10           Good morning, Your Honor.

11           THE COURT:  Good morning.

12           MR. STERN:  David Stern for Mr. Pughe who, I guess,

13   either has or has been exposed to the chicken pox and so, he

14   isn't here.

15           THE COURT:  Okay.

16           THE COURTROOM DEPUTY:  We're still waiting for one

17   more.

18           MR. KAMDANG:  We're waiting for Mr. Taylor.

19           Len Kamdang on behalf of Dewayne Taylor.  With me,

20   also, is my intern Amanda Rohrkemper.

21           (Pause in the proceedings.)

22

23           (Defendant Dewayne Taylor enters the courtroom.)

24           THE COURT:  All right.  Mr. Stern, will you waive

25   Mr. Pughe's appearance for the purposes of discussing

Proceedings                                    4

1    scheduling, which we have to do?

2              MR. STERN:  Yes, of course.

3              THE COURT:  Mr. Amatruda, I understand that you

4    found out this morning that Mr. Pughe was not going to be

5    produced because he had been exposed to the chicken pox.

6              MR. AMATRUDA:  That's correct, Your Honor.

7              I received a call from the Marshals Service, a

8    message when I arrived in my office this morning, stating that

9    Mr. Pughe is at the Metropolitan Correction Center, the MCC in

10   Manhattan, and that his unit currently under quarantine

11   because of an exposure or an outbreak, I should say, of the

12   chicken pox.  I did follow up with a call to the MCC and

13   received confirmation that that's the case.

14             The officer with whom I spoke at the MCC also

15   informed me that in cases such as this where there is a

16   quarantine, there is -- it is effectively impossible to get

17   the defendant produced for court.

18             THE COURT:  What about the length of the quarantine?

19             MR. AMATRUDA:  Your Honor, the estimate I received

20   was approximately a week.

21             I followed up with a call to the MCC's medical unit,

22   but I was unable to reach them.  The number, there was no

23   answer at the number before I had to come to court today.

24             THE COURT:  Well, what, if any, problems are there

25   with the parties' availability in the next two weeks?

Proceedings                                5

1       MR. STERN:  I could try this case any day next week.

2   As it happens, I have a lot of time next week.  And after

3   that, for at least three weeks, I'm not going to be around

4   very much.  So, I would be glad to do it any day next week

5   that's good for you and good for anyone else.

6           And I still anticipate that this will be a two-day

7   trial.  I don't know everyone else's schedule, but if we could

8   squeeze in any days next week, I think it would be fine.

9       MR. KAMDANG:  I have a trial starting on June 29th.

10  My preference would be to the do the trial earlier next week

11  rather than later.  But if it's going to be a week, I guess

12  Wednesday and Thursday, I could do both of those days.  This

13  is a detained trial and the other one is not, so.

14      THE COURT:  Well, is there any way we can find out

15  whether there's a possibility that he'll be available.

16          He's at MCC and Mr. Taylor's at MDC; right?

17      MR. KAMDANG:  That's correct, Your Honor.

18      MR. AMATRUDA:  Judge, there was one way.  I do have

19  the phone number for the MCC.  We can call.  As I said, they

20  just weren't in when I tried them.

21      THE COURT:  Do you want to try them now and see if

22  we can reschedule this trial?

23      MR. STERN:  I don't know if we know when the

24  quarantine started.  If it started Monday, we could maybe do

25  this on Monday.

```
                        Proceedings                       6
```

1              THE COURT:  Right.

2              MR. AMATRUDA:  Right.

3              MR. STERN:  I don't know if a week is an absolute.

4    I don't know anything about this.

5              THE COURT:  We need to find that out.

6              MR. AMATRUDA:  Okay.  If I could call, Your Honor?

7              THE COURT:  Okay.  You want to call?

8              MR. AMATRUDA:  I'll just do it right now.

9              (Pause in the proceedings.)

10

11             MR. AMATRUDA:  Your Honor, I spoke with personnel at

12   the MCC who informed me that that -- first, they transferred

13   me to the medical unit and there was no answer.

14             So, then I called and asked whether there was

15   anybody else who might assist us and I was informed that the

16   people who could assist us are currently in a meeting.  I

17   attempted to have someone pulled out of the meeting, but I was

18   transferred to a number that there was no answer for.

19             So, I just called Deputy United States Marshal

20   Sheehan in the Eastern District of New York and he offered to

21   make inquiries there.  Perhaps he has a better way of

22   contacting BOP officials than I do.

23             I gave him my telephone number and he told me he

24   would call right away and give me a call back.

25             THE COURT:  Okay.  Well, why don't we wait a few

1  minutes and see if there's something we can find out in the

2  interim.

3           Is it all right with you, Mr. Stern, that we take up

4  some just strictly legal issues in the absence of your client?

5           MR. STERN:  It is.

6           THE COURT:  Okay.

7           There seem to be a number of issues that are

8  outstanding and objections that have been interposed to

9  certain evidence the Government seeks to introduce.

10          THE COURTROOM DEPUTY:  Judge, I just spoke with,

11  apparently, the same gentleman that Mr. Amatruda spoke with.

12          THE COURT:  Sheehan.

13          THE COURTROOM DEPUTY:  He said he would call me

14  back.

15          THE COURT:  Okay.  Is he also checking into --

16          THE COURTROOM DEPUTY:  He is, but he wanted to give

17  me that number first.

18          THE COURT:  Okay.  All right.

19          THE COURTROOM DEPUTY:  I'm just going to wait back

20  here.

21          THE COURT:  Okay.

22          So, I've tried to make a list of all the outstanding

23  issues.  One of the pieces of evidence that the Government

24  seeks to introduce is the fact that the defendants both had

25  outstanding arrest warrants.  I don't know if some issue could

Proceedings                              8

1   arise at trial that might possibly make that relevant.  At

2   this point in time, I don't see the relevance of that

3   particular piece of information.

4            So, without prejudice to something arising at trial

5   that might make it relevant, I would at this point preclude

6   the Government from eliciting that the defendants have arrest

7   warrants outstanding.

8            The same ruling is true with respect to the

9   possession of the OxyContin; it doesn't relate to the

10  conspiracy.  And again, at this point, from what I know of the

11  case, unless something comes up that would make it relevant,

12  or make it more relevant let me say, I would not permit the

13  introduction of that evidence.

14           In terms of Mr. Taylor's legitimate job, I suppose I

15  should say, the Government wants to offer evidence that he was

16  not working.  And if I understand it correctly, it's that on

17  the date of the arrest they found $7,000 in cash in his hotel

18  room?

19           MR. AMATRUDA:  Actually, Judge, it's not that they

20  found it.  It's that he had conversations with at least one

21  witness, actually several witnesses, following that, talking

22  about the fact that there was $7,000 in his hotel room.

23           THE COURT:  Now, how is the Government going to

24  prove this?  Through testimony of a witness or through --

25           MR. AMATRUDA:  Judge, in two ways.

Proceedings                                            9

1          One is the testimony of a witness who spoke with --

2     the defense is aware of who the witness is, it's Ms. Hyatt --

3     who spoke with the defendant about this matter.

4          And then, the second thing is during recorded phone

5     conversations that Mr. Taylor made from the MDC.  He refers to

6     it on several instances.

7          THE COURT:  Is there going to be any testimony that

8     establishes this money directly as narcotics --

9          MR. AMATRUDA:  No, Judge.

10         THE COURT:  -- proceeds?

11         MR. AMATRUDA:  The proof would be that from personal

12    knowledge, based on interactions with Mr. Pughe, he had

13    absolutely no source of income other than drugs.

14         THE COURT:  Okay.  And is this person -- and this is

15    through a witness?

16         MR. AMATRUDA:  Correct, Judge.

17         THE COURT:  And this witness is also a witness to

18    his drug dealing.

19         MR. AMATRUDA:  Correct.

20         THE COURT:  All right.  So, that $7,000, it seems to

21    me, is admissible under those circumstances.

22         There's another $30,000?  What's that about?

23         MR. AMATRUDA:  Yes, Judge.  That, concededly, is

24    more vague.

25         It's a discussion, again, during an MDC telephone

Proceedings                                    10

1   call where the defendant refers to having $30,000 in the trunk

2   of his car when he's visiting -- in cash, when he's visiting

3   his mother in New York.  He gives a thousand dollars of that

4   to his mother.

5           The witness that we have -- and obviously this is

6   going to depend on Your Honor's take on our other

7   applications, but -- is in a position to testify that for the

8   entire -- well, actually that's not true.

9           The defendant was released from jail, initially, in

10  2003.  So, from about 2005 through 2006.  Then, he's in jail

11  again.  And then, from -- during 2008, which is when he was

12  again released from prison, he had no income.  So, you're

13  talking about an individual that was in jail from 1995 to

14  19 -- to 2003 and then, basically, he spends a total of

15  three-and-a-half, four years out of jail and he has $30,000 in

16  the trunk of his car.  He's dealing drugs for the period that

17  my witness is aware of consistently throughout this period.

18          So, I think it's a reasonable inference to ask the

19  jury to infer that this is, that this is drug money.  But

20  again, concededly, it's not of the same, it's not -- it's not

21  as direct of a reference because I don't know when he actually

22  possessed that $30,000.

23          (Pause in the proceedings.)

24

25          THE COURT:  Counsel?

```
                        Proceedings                         11
```

 1          MR. KAMDANG:  Can we revisit this $7,000?

 2          THE COURT:  Yes.

 3          MR. KAMDANG:  The issue of $7,000 first.

 4          The problem that we have about the $7,000 -- and we

 5    learned last night, Linsey Hyatt is the quote, unquote

 6    "mystery witness" that I referred to -- is that Ms. Hyatt

 7    dated Mr. Taylor sometime around 2006 and they had a

 8    relationship then.

 9          And while she had a relationship with him then, the

10    time of the instant conspiracy here, by her own admission, she

11    has not had much contact with Mr. Taylor and I'm not sure she

12    has a basis of knowledge to testify about what his employment

13    situation is during this time.  I don't know that she's ever

14    asked him if he's ever had a job or if he's ever said 'I don't

15    have a job.'  It's my understanding that she doesn't really

16    speak to him at all about what's going on during this time

17    period.

18          The second problem that we have here in terms of the

19    $30,000 is I think the Government is assuming that this is all

20    one great conspiracy.  In the discovery we got yesterday

21    Ms. Hyatt indicates she never heard of Mr. Pughe.  And even if

22    we accept that there was something going on with Mr. Taylor

23    and Mr. Pughe, there's no indication that that enterprise had

24    anything to do with what was going on in 2006.  Even if we

25    assume that everything is true.

Proceedings                                    12

1         And I think that -- I don't think there's any basis

2    to say that they are connected in any way.  There's no nexus

3    and I'm not sure the Government has any direct proof that

4    there is a nexus.  The reason why I say that is that the

5    methods that Ms. Hyatt talks about in terms of how these drug

6    interactions were happening differs significantly from what

7    the Government is alleging here.

8         It's my understanding that Mr. -- what she's going

9    to say is that Mr. Taylor and associates personally went up to

10   New York to bring drugs down and there's no indication that

11   he's ever paid somebody to come down with drugs.  She's not

12   going testify to that.  There's no indication that when he did

13   that, he put drugs in the glove compartment.  There's just no

14   connection.

15        THE COURT:  The $7,000, the timing of it is that it

16   will be right around the date of the particular transaction

17   that references this trial; right?

18        MR. AMATRUDA:  That's right, Judge.

19        You know, I think part of the problem, frankly,

20   Your Honor, is that we're trying to litigate foundation issues

21   before the witness has testified.

22        I believe that this witness is going to testify as

23   to consistently witnessing this defendant's course of dealing.

24   And later on in her dealings with him, she actually does speak

25   to him.  She does see him.  She does discuss his drug

Proceedings                                    13

1   activities with him.

2           Furthermore, this witness actually did see the

3   defendant and another co-conspirator receive an individual

4   from the bus from New York City.  He was transporting drugs.

5   But I think, but I would be willing to wait until we hear some

6   testimony from this witness and establish the proper,

7   establish a foundation for this.

8           And I believe that while I believe that it is

9   entirely relevant and that Your Honor could rule now, you

10  know, as opposed to arguing the hypotheticals here before you,

11  I'm happy to have the witness testify and have Your Honor make

12  a ruling then.

13          THE COURT:  All right.  That seems to make sense.

14  I'm certainly not going to rule it out.

15          MR. AMATRUDA:  Okay.

16          THE COURT:  At this point in time.

17          MR. KAMDANG:  Okay.

18          (Pause in the proceedings.)

19

20          MR. AMATRUDA:  I apologize for interrupting,

21  Your Honor.  I just received a call from the Marshals Service

22  while you were speaking.

23          Is it okay --

24          THE COURT:  Do you want to take it?

25          MR. AMATRUDA:  Is it okay if I call them?

Proceedings                        14

1          THE COURT:  Yes.

2          (Pause in the proceedings.)

3

4          MR. AMATRUDA:  Your Honor, I just received a call.

5    I just spoke with Deputy Marshal Sheehan.  He actually was in

6    contact with the warden of the MDC, Duke Terrell.  He left me

7    a phone number and said that Warden Terrell is awaiting

8    Your Honor's call if you want to call him.

9          THE COURT:  Do you have his number?

10         MR. AMATRUDA:  His telephone number is (646)

11   836-77 --

12         THE COURT:  (646).

13         MR. AMATRUDA:  836-7700.

14         THE COURT:  Zero, zero?

15         MR. AMATRUDA:  Correct.

16         THE COURT:  Terrell.

17         MR. AMATRUDA:  Correct, Judge.

18         (Pause in the proceedings.)

19

20         THE COURT:  I just spoke with the warden and the

21   warden says he's going to have the medical people pull out

22   Mr. Pughe and talk to him.

23         He says that if Mr. Pughe advises them that he's

24   actually had the chicken pox before, that he could be produced

25   today.  If not, then he has to stay.  He has to be

```
                        Proceedings                    15
```

1   quarantined.  So, he's going to get back to me in about a half

2   an hour, he said.

3           Let me ask you, have all the parties here had

4   chicken pox?

5           Mr. Stern?

6           MR. STERN:  I think I have, yeah.

7           MR. KAMDANG:  I've had chicken pox.

8           THE COURT:  Have or have not?

9           MR. KAMDANG:  I have.

10          THE COURT:  All right.

11          Mr. Taylor, have you had chicken pox?

12          THE DEFENDANT:  (No response.)

13          THE COURT:  Have you had chicken pox?

14          THE DEFENDANT:  Yeah.

15          THE COURT:  You have had it before?

16          MR. KAMDANG:  Yes.

17          THE COURT:  He's asking his mother, I think.

18          How about everyone at defense table?

19          AGENT McNALLY:  Yes.

20          MR. AMATRUDA:  Judge, Ms. Principe has not had it

21  before, but other than that, we have.

22          She's offered to step outside the courtroom in the

23  case that there's a risk.

24          THE COURT:  Well, if there's really a risk, they're

25  not going to let him come over.

Proceedings                    16

1      MR. AMATRUDA:  Correct.

2      THE COURT:  I was just asking the question.

3      The warden told me that the medical people said that

4  if he's had it, first of all, he's not going to get it; but

5  also, that he's not a carrier.

6      So, he did suggest that for safety reasons, they may

7  ask him to wear a mask.

8      MR. STERN:  No.

9      THE COURT:  I know.

10      MR. STERN:  No.

11      THE COURT:  I suggested that that wouldn't work in

12  the courtroom and that if he had to wear a mask, it would be

13  problematic.

14      MR. STERN:  That would be frowned on by the defense,

15  Your Honor.

16      THE COURT:  Yes.

17      MR. KAMDANG:  Your Honor, could we revisit another

18  issue with the employment?

19      THE COURT:  Well, we seem to be revisiting

20  everything, but what?

21      MR. KAMDANG:  The issue with Probation Officer Rick

22  James.

23      THE COURT:  Well, I think they could prove

24  unemployment through another witness.

25      Correct; Mr. Amatruda?

```
                          Proceedings                    17
```

1        MR. AMATRUDA:  Yes.

2        THE COURT:  So, if you can prove it through another

3   witness, I don't want you proving it through the probation

4   officer.

5        MR. AMATRUDA:  That was our intention, Judge.

6        THE COURT:  Okay.

7        MR. AMATRUDA:  And I told Mr. Kamdang that we, if,

8   if it comes through another witness, then we have no intention

9   of calling him.

10        MR. KAMDANG:  I guess my -- even if they can't prove

11   it through another witness, I don't understand how Rick James

12   can establish that he didn't work during the conspiracy at all

13   since he had no interaction with the man.

14        THE COURT:  Well, they're not going to call Rick

15   James, as far as I understand.  I just heard Mr. Amatruda say

16   they're going to prove that he wasn't working through another

17   witness.

18        MR. AMATRUDA:  That's right, Judge.  I just, the

19   only thing I told Mr. Kamdang, Mr. Kamdang had asked me to

20   place on the record, sort of unequivocally, that I wasn't

21   going to ask to call Officer James.  And what I told

22   Mr. Kamdang was that in the event something unforeseen

23   happens, I may ask to call him.

24        THE COURT:  We can see if something happens.  We can

25   address it now, but there's no sense taking the time to deal

Proceedings                          18

1   with it now.

2           MR. KAMDANG:  But --

3           MR. AMATRUDA:  Yeah.

4           THE COURT:  The other issues deals with the fact

5   that the SUV was registered in someone else's name.

6           Now, I understand that you have a witness that's

7   going the lay the foundation why that was the way business was

8   done during the course of the conspiracy.

9           MR. AMATRUDA:  That's right, Judge.  Well, it's

10  also, not to mention, the SUV's in her name.  So, I mean.

11          THE COURT:  Oh.

12          MR. AMATRUDA:  So, certainly it's entirely wrapped

13  up in what happened.

14          THE COURT:  Okay.  So, that seems to be appropriate.

15          The wire transfers.  Again, as I understand it,

16  there are certain wire transfers of money and these wire

17  transfers go from Tennessee to Brooklyn.

18          MR. AMATRUDA:  That's correct, Judge.

19          THE COURT:  And one of them is to Pughe.

20          MR. AMATRUDA:  One of them.  Two of them are to

21  Ms. Jones, who is Pughe's girlfriend.

22          THE COURT:  Okay.  So, how do we get past Ms. Jones

23  to any relevant subject matter?

24          MR. AMATRUDA:  Well, Judge, I, I had, I had asked

25  defense counsel, and I believe they've agreed to stipulate,

Proceedings                                    19

1  that she is his girlfriend.  So, I would -- especially because

2  the money went the day before Mr. Pughe got on the bus to

3  leave.

4          And there's also a telephone call from the MDC where

5  Mr. Pughe says, "he sent me the money for the bus."  I think,

6  I think there's a foundation there.

7          THE COURT:  Oh.  All right.  Well, it seems that

8  that would.

9          MR. STERN:  Assuming you think those are admissible,

10 it's accurate, we've reached an agreement.  The way he'll

11 handle it -- I think we've reached an agreement -- that that's

12 his girlfriend and she was wired money which -- pursuant to

13 this conversation, which I don't think the jury needs to know

14 where the conversation takes place.

15         THE COURT:  Right.

16         MR. STERN:  He got the $400 or whatever it is.

17         THE COURT:  All right, then.

18         MR. STERN:  That shouldn't be taken as my consent of

19 coming in, but understanding your ruling is it will come in

20 that's our agreement on how to handle it.

21         (Pause in the proceedings.)

22

23         THE COURT:  All right.

24         In terms of Mr. Taylor's prior conviction.  How is

25 it that the Government intends to prove that?  By offering his

Proceedings                                    20

1    trial testimony in the other case?

2         MR. AMATRUDA:  That's right, Judge.  He testified as

3    a Government witness in his co-defendant's case and he

4    testified about the facts of him having the 40 grams of crack

5    in his pocket at the time he was arrested.

6         THE COURT:  Now, I wasn't clear.  Does the

7    Government want to independently prove this or are you just

8    using it as 608?

9         MR. AMATRUDA:  Judge, I think it's admissible under

10   Rule 404(b).  But in the alternative, we would ask that it be

11   the basis of cross-examination under Rule 608.

12        THE COURT:  Well, under 404(b) you say that it's

13   relevant to the issue of knowledge principally because, I

14   guess, the crack cocaine was not directly in Mr. Taylor's

15   possession and the question of whether he was in a car that

16   knowingly had, that he knew had crack cocaine in it is

17   relevant.

18        MR. AMATRUDA:  That's exactly right, Judge.

19        THE COURT:  Mr. Kamdang, I take it your client is

20   not going to stipulate knowledge that was the case?

21        MR. KAMDANG:  That's correct, Your Honor.

22        THE COURT:  Well, I would be inclined to permit the

23   Government to prove it, but I would ask you not to let the

24   case develop and await a final ruling after I listen to

25   cross-examination and hear the opening statements.

Proceedings                                        21

1          So, don't mention it in your opening statement.

2          MR. AMATRUDA:  Okay, Your Honor.

3          THE COURT:  Okay?

4          Now, Mr. Taylor has objected to certain

5     conversations in a letter dated June 16th.

6          Has the Government conceded to any of those or are

7     they all still issues?

8          MR. AMATRUDA:  Your Honor, frankly, I have not had a

9     chance to go through everything in Counsel's letter, but I

10    can -- let's see.  If Your Honor would just, would allow me a

11    moment to see what it was.

12         THE COURT:  How many conversations does the

13    Government intend to put in?

14         MR. AMATRUDA:  There are about, well, there are

15    portions, Judge, of about ten to twelve, I would say.

16         THE COURT:  And these are just Mr. Taylor's

17    conversations; correct?

18         MR. AMATRUDA:  There are, there are probably three

19    from Mr. Pughe.  It looks like the, Mr. Taylor's objections

20    pertain to his own conversations.  And Judge, it looks like at

21    least the first few calls again visit this issue of the

22    defendant's cash.

23         So, I would propose that -- I wasn't intending to

24    put these in until the end of the Government's case anyway and

25    I wasn't going to mention them in my opening either.  So, I

Proceedings                                        22

1   would just propose that as to calls A through D, we hear the

2   evidence that comes in.  And then, when it comes time to play

3   the tapes, I would ask Your Honor to consider admitting them

4   at that point based on their relevance.

5              THE COURT:  All right.  What about E?  Is the part

6   that's on page four that's bracketed, does the Government want

7   to put that in for some reason?

8              MR. AMATRUDA:  Judge, that's, it's true that not all

9   of the conversations, I don't, on page -- is it page four,

10  Judge?

11             THE COURT:  Page four is what I understand you're

12  objecting to; right, Mr. Kamdang?

13             MR. KAMDANG:  Yes, Your Honor.

14             MR. AMATRUDA:  Oh, I see.  My page four doesn't have

15  bracketed material.  My page four is...

16             MR. KAMDANG:  It might be the wrong Exhibit.

17             THE COURT:  E.

18             MR. KAMDANG:  E.

19             MR. AMATRUDA:  Oh, okay.

20             (Pause in the proceedings.)

21

22             MR. AMATRUDA:  Well, Judge, I think that the

23  significance of that call is that the defendant's talking

24  about "going up and down," which I believe will be clear once

25  the evidence comes in.  It refers to up and down between

```
                         Proceedings                      23
```

1   New York and Tennessee.

2          But again, it's not, it's not a critical element to

3   our case.  If -- I may end up not offering it depending on how

4   the rest of the evidence comes in and it may be that --

5          THE COURT:  So, you weren't offering this to prove

6   that he was somehow talking about the strength of the case

7   against him?  Is that it?  I didn't get that.

8          MR. AMATRUDA:  No, no, Judge.  It refers to losing

9   drugs, I believe.  I mean, that's our argument; that it refers

10  to losing money or drugs.

11         THE COURT:  Why did you think it meant something to

12  do with the strength of the case, Mr. Kamdang?

13         MR. KAMDANG:  My point was not that I thought it was

14  the theory of the Government's submission.  My point was that

15  I read this to be just blustering about what he thinks of the

16  case.  It seems like nonsense.  It's just prejudicial and

17  meaningless opining.

18         THE COURT:  I think you're talking about two

19  different things.  The Government's theory is that he's

20  talking about the strength of the case.

21         MR. KAMDANG:  What I'm saying is, I don't think it

22  has any basis at all.  All it is, is just meaningless opining.

23         THE COURT:  But that's not what they're saying he's

24  talking about.  He's not talking about the strength of his

25  case.  According to them, they believe he was talking about

Proceedings                                   24

1   some drug deals go well, some drug deals go bad?

2          Is that it.

3          MR. AMATRUDA:  That's right, Judge.  It relates to

4   his going up and down between Tennessee and New York and how

5   he had to work hard and at times you lose money or drugs and

6   you just have to keep going.

7          MR. KAMDANG:  We read it a different way.

8          MR. AMATRUDA:  And --

9          THE COURT:  Well, the Government's not going to

10  argue that he's talking about the fact that, if they put it

11  in, they're not going to make the argument you're making.

12  They're making the other argument.

13         MR. KAMDANG:  I understand.

14         THE COURT:  All-righty.

15         Moving on to conversation F.  Is the Government

16  seeking to put this conversation in?

17         MR. AMATRUDA:  Judge, I guess in offering it I

18  wasn't aware of there being an issue in terms of referring to

19  this conversation.  I guess I, if Counsel, I just -- I wasn't

20  aware of what the issue was with it and if there is one, I

21  obviously would reconsider.

22         THE COURT:  All right.  So, you're not intending to

23  offer conversation F.

24         MR. AMATRUDA:  Well, Judge, I think that, I think

25  that the only portion that's objectionable with respect to

Proceedings                                    25

1   referring to Counsel's conversations.  If that's the concern

2   with the conversation, it's just the, it's just the first nine

3   lines really.  Then he goes, that's the only time he's talking

4   about conversations with Counsel.  After that he says, "when I

5   was talking with her in the thing, she's like, I'm not paying

6   it no mind."

7            And from there on in I don't believe that he talks

8   about any conversations that he had with lawyers.

9            THE COURT:  Well, what's the theory here?

10           MR. AMATRUDA:  Well, Judge, he's talking about

11  whether Ms. Wright is going to testify against him.

12           THE COURT:  Right.

13           MR. AMATRUDA:  And he says, you know, I'm talking to

14  her on the phone, don't -- I'm not paying them any mind about

15  testifying against him.

16           And then, he goes on to say:  "That's what I told

17  her.  Just stay whole.  Just stay focused.  Just stay

18  focused."

19           And then he says later:  "Just hold it down."

20           And then she says:  "Just tell me what to do."

21           And he says:  "Don't worry about it."

22           And then she says:  "The only way this is going to

23  work is if us sit together and talk."

24           So, I think that taken together the conversation

25  really refers to him telling Ms. Wright to not to testify

Proceedings                                    26

1    against him.  "Just hold it down."  That's what that means.

2              MR. KAMDANG:  Your Honor --

3              MR. AMATRUDA:  I mean, if there are certain lines,

4    obviously, you know that are problematic, maybe we can hear

5    what those are.

6              MR. KAMDANG:  And I guess the problem is I'm not

7    sure that the conversation makes sense without the piece that

8    is problematic here.

9              I take it the Government's theory -- and I can't

10   dispute that that does seem to be the subject matter.  The

11   issue, though, is that it implicates the right to counsel.

12   And given that I think the Government has this sort of

13   conversation in three or four different other places, I

14   don't...

15             THE COURT:  You do have this conversation in other

16   places?

17             MR. AMATRUDA:  Not the same, but correct, Judge.

18   Talking about "holding it down."

19             THE COURT:  Well, why don't we reevaluate.  I don't

20   want the part coming in about talking to the lawyers and

21   looking at the lawyers and talking about "breaking it."

22             MR. AMATRUDA:  That's fine, Judge.  Okay.

23             THE COURT:  If you've got it in other conversations,

24   let's not use this one.  I don't know how you break it out of

25   the context.  It's not clear.

Proceedings                                    27

1           MR. AMATRUDA:  Okay.

2           THE COURT:  All right.

3           Now, I take it the accomplice witness is going to,

4    Ms. Hyatt, is going to talk about background to the conspiracy

5    in that there was a similar conspiracy a couple years ahead of

6    time?

7           MR. AMATRUDA:  Judge, yes.  And it's, I think it's

8    an issue that where Ms. Hyatt's testimony is really going to

9    be quite confusing if she can't talk about when she met the

10   defendant and under what circumstances she met him.  She also

11   met many of his co-conspirators who then returned again to

12   Tennessee.

13          So, you're talking about, first you're talking about

14   the 2005-2006 time period.  Many of the same people returned

15   to Tennessee in 2008.  They're doing the exact same thing in

16   2008.  The conspiracy's operating in a similar way.  During

17   that entire time period she has direct firsthand knowledge of

18   what is going on.

19          THE COURT:  The charged conspiracy.

20          MR. AMATRUDA:  Well, the charged conspiracy;

21   correct.  But I'm also talking about the period prior to the

22   charged conspiracy.

23          So, in other words, there's, she met the defendant

24   in 2005 because she was using drugs and she was at one of his

25   drug selling locations.  And from that point on she -- he

Proceedings                                    28

1   offered to take care of her, basically, and he supported her

2   and she was with him constantly.  They were basically living

3   together except for that they didn't have a steady residence.

4   She was with him on drug trips back and forth from New York.

5   Then, when the defendant's arrested in 2006, they go separate

6   ways.

7          In 2008, he returns again upon his release in early

8   2008, February or so, and the defendant starts up his same

9   activities.  And while they're not, their relationship isn't

10  the same at that point, she is regularly with the defendant.

11  The defendant, the defendant actually stays at some points in

12  her father's house, who's also a crack user.  And so, she sees

13  the defendant there.

14         She also goes out to meals with the defendant and

15  his one -- another co-conspirator where they're talking about

16  their drug activities.  She goes to pick the defendant up from

17  his drug-selling locations, again during his second stint

18  there.  And then, what happens is over time, during that

19  second stint spanning from February to November of 2008, she

20  continues to see the defendant.  She just sees him less often.

21  So, as opposed to every day, she may see him once a week.

22         And again, though, the, the pattern of activities is

23  similar.  Their conversations continue about this information,

24  but it's for, it would come -- I believe it would come out as

25  very unnatural to the jury if this witness just starts

Proceedings                                    29

1    testifying in the middle of her interaction with the

2    defendant, gives no basis for how she knows any of the

3    information that she's testifying about except for that they

4    speak about it and she sees it.

5         I mean, obviously, when there's that long of a

6    relationship with people, there's references to things that

7    happened before.  There's understandings based on words that

8    are said that are based on the experiences that happened

9    before then.  So, I don't, I think that this is really, while

10   it's a -- while there was an interruption in the conspiracy,

11   it basically is the same.  It is the same conspiracy just

12   reformed once the defendant comes back and involves the same

13   other individuals.  It involves again, the same customers, the

14   same people who are, who are in the same places or -- not the

15   same places, but the same people's homes that they're using

16   often to sell drugs from.  And so, it's really wrapped up.

17        In addition, there's another issue which is that

18   some of the defendant's misconduct that would elicit on

19   direct -- I'm sorry not the defendant's misconduct -- some of

20   the witnesses own misconduct, which we would elicit on

21   direct -- took place during this time period when -- in

22   2005-2006.  It's going to be very, I don't know how the jury's

23   going to be able to understand what happened during that,

24   during her period that she did things that were wrong without

25   understanding the context.

Proceedings                          30

1          The big example is that when -- when the defendant

2   was arrested for his supervised release violation in 2006, he

3   called the witness up and told her -- he strongly implied to

4   her that there were drugs in the car that he was arrested with

5   and she participated in going up to where the car was and

6   removing drugs from this car.  And obviously, that's something

7   that she's going to admit to and have to testify about, but it

8   does seem difficult to make -- give the jury a fair

9   understanding of what happened without going into these prior

10  events.

11         THE COURT:  Well, they're two different issues.  If

12  it were otherwise not relevant, the fact that she is admitting

13  to criminal conduct doesn't somehow make it relevant that the

14  defendant was involved with her.  So, the fact that she has to

15  admit to it doesn't mean that, in fairness, it has to come out

16  that he was involved.  That's not a basis for its submission.

17         I suppose the argument would be that it's necessary

18  to come in to explain her relationship to the defendant, the

19  other parties and the background of the conspiracy.

20         How do we deal with the issue of the fact, though,

21  that he was arrested?

22         MR. AMATRUDA:  I would just propose.

23         THE COURT:  He was arrested and away for two years

24  on what?

25         MR. AMATRUDA:  Supervised release violation.

Proceedings                                    31

1          THE COURT:  He was incarcerated for two years on a

2    supervised release violation?

3          MR. AMATRUDA:  It was 21 months.  I'm not sure how

4    much he served, Judge, but he was incarcerated in, I believe,

5    the MDC.  He was being supervised from this district.

6          THE COURT:  Well, how can you develop this without

7    going into that?

8          MR. AMATRUDA:  Well, I would just have the witness,

9    ask the witness whether the defendant's and her's relationship

10   ended during that time period the defendant away from

11   Kings Port and that he returned.

12         THE COURT:  Oh, all right.  So, you can bring, you

13   plan to elicit without indicating that.

14         MR. AMATRUDA:  Absolutely, Judge.

15         THE COURT:  All right, Mr. Kamdang, why isn't it

16   relevant to the background of the conspiracy and her

17   relationship with this defendant?

18         MR. KAMDANG:  Well, I think there's a couple issues.

19   The first issue is that to allow all of this testimony that is

20   basically going to be 90 percent on background completely

21   changes the character of the case and it becomes a situation

22   where the tail begins to wag the dog of the entire trial.

23         We had no notice of this.  We had no notice that we

24   were to be defending on this.  We've been asking for

25   information on it.  We just learned last night about all of

Proceedings                                    32

1    these allegations and we would need time to investigate these

2    allegations.  We're talking about things that happened in

3    2006.

4           All we had in this case was an indictment.  This

5    case has always been about a car stop that happened on

6    November 18th, 2008, between Jessie Wright and Darien Pughe;

7    that that's what we've been focusing on.  And I believe that

8    there's only, of all the testimony, there would only be one

9    incident that even falls within the specified time period on

10   the indictment.

11          So, this whole case will be about litigating, if

12   Ms. Hyatt's allowed to testify to this stuff, this whole case

13   will be about litigating these background issues that are

14   ancillary to what this case should have been about.  And

15   again, there's no indication that any of this other activity

16   is related to what we've been focused on this whole time, the

17   locus of this case being this car stop and this alleged

18   conspiracy between Mr. Pughe and Mr. Taylor and Ms. Wright.

19          MR. AMATRUDA:  Judge, first of all --

20          THE COURT:  I mean, to the extent that it is 404, it

21   is 404(b) evidence, the theory of admissibility as it pertains

22   to background.  But it still remains 404(b).

23          What about the notice issue?

24          MR. AMATRUDA:  Well, Judge, we did provide notice in

25   our letter, our 404(b) motion, to -- that we had received

Proceedings                                33

1  information from this witness.  We provided the letter,

2  basically, as soon as we had we learned that we were going to

3  be able to secure the witness's testimony.  So, you know, I

4  wasn't, we weren't, the Government wasn't in a position to

5  provide notice of anything prior to however long it took me to

6  put the brief together, which was not very long.  And so, we

7  did file a motion.

8          Second of all, as to the issue of what this case was

9  focused on, he was indicted for a conspiracy charge and

10  there's, as far as admitting evidence of the conspiracy goes,

11  we have, we intend to admit evidence and activities in

12  furtherance of it.

13          THE COURT:  Well, yes.  I think the one thing you

14  were complaining about, about an arrest and putting up bail

15  and all of that, that was part of the charged conspiracy

16  according to the Government; right?

17          MR. AMATRUDA:  Yes, Judge it was.

18          THE COURT:  All right.

19          So, I don't know that you're entitled to advance

20  notice of all the testimony of what the testimony's going to

21  be about the charged conspiracy.

22          MR. KAMDANG:  It's my understanding that that's the

23  issue to be prevailed upon.  As of last night, that wasn't

24  coming out.

25          MR. AMATRUDA:  Actually, Judge, I think what it was

Proceedings                                    34

1   when I was talking to Mr. Kamdang, I told him that there was a

2   raid on an apartment or on a hotel room of people who were

3   Mr. Taylor's co-conspirators and there was drugs seized.

4            And I had told Mr. Kamdang that there was --

5   initially, we were exploring whether Mr. Taylor had bailed out

6   these people from jail.  We learned that they had not, but we

7   still intend to admit the evidence based on a foundation that

8   the defendant had informed our witness that he had just been

9   there before this happened, that these were people that she

10  well knew were his co-conspirators based on things that she

11  witnessed even during the period of the charged conspiracy.

12  It certainly is an event that happened as part of this

13  conspiracy.

14           THE COURT:  What, in terms of the period of time

15  that pre-dated the conspiracy, the background information.

16           This will be testimony from this witness that she

17  was present, she met the defendant, she was witness to his

18  drug-dealing during this time, which was similar to the

19  drug-dealing that he engaged in here and, in effect, the only

20  way in which it was interrupted was because of his supervised

21  release violation?

22           MR. AMATRUDA:  That's correct.

23           THE COURT:  He would have continued business as

24  usual?

25           MR. AMATRUDA:  That's correct, Judge.  The first

Proceedings                                    35

1   thing the defendant did when he came back from supervised

2   release was to find -- ask people where everybody was,

3   referring to customers and people involved in the conspiracy.

4   He just started up the business again.

5          THE COURT:  All right.

6          You talked about an adjournment.  What would you

7   investigate and how would you investigate this, Mr. Kamdang?

8   I mean, it's similar to what the Government's going talk

9   about.  What do you need to do?

10         MR. KAMDANG:  Well, Your Honor, we will now be,

11  there are now, it seems like there would be -- we'll be

12  discussing ten or eleven new witnesses and new people that

13  will be discussed and I have no idea who these people are.

14         THE COURT:  I don't think there are new people that

15  weren't, that aren't going to be discussed other than as part

16  of the charged conspiracy; correct?

17         MR. AMATRUDA:  Yes, Judge.  There are -- a few of

18  the peripheral characters obviously aren't there.  It's timed

19  to different times, but the core people involved in this

20  conspiracy were the same.

21         MR. KAMDANG:  Your Honor, we never discussed --

22  there's been no indication of customers asking about, we

23  learned the names of two other associates yesterday in the

24  discovery that was turned over.

25         The problem here is this; that what we received here

Proceedings                              36

1   was an indictment that talked about September through November

2   of 2008.  The Government is now saying that this is actually a

3   conspiracy that lasted from 2006 to 2008.  And we're more than

4   quadrupling the period of conspiracy we're defending against

5   and we had no knowledge of that until yesterday.

6             THE COURT:  No, I think the Government had given you

7   a letter before that talked about the evidence predating 2008.

8   In June.

9             A June 1st letter made reference to that; is that

10  correct?

11            MR. AMATRUDA:  June 8th letter, Judge, it looks

12  like.  I'm just going off defense counsel.

13            THE COURT:  June 8th.

14            MR. KAMDANG:  There was a June 8th letter.  So,

15  we're talking a week ago.

16            THE COURT:  And you've got all of the 3500 material

17  on that now?

18            MR. KAMDANG:  We got the 3500 material last night at

19  5:30.

20            THE COURT:  So, what would you need to do,

21  Mr. Kamdang?

22            MR. KAMDANG:  Well, for example, this witness is

23  testifying that my client bailed --

24            THE COURT:  I thought she's not testifying.

25            She's not testifying to that.

Proceedings                                    37

1        MR. AMATRUDA:  That's right, Judge.

2        MR. KAMDANG:  Well, what if she's provided

3   information about that that turns out not to be true.  I have

4   no idea what other information would turn out not to be true

5   and I would want to investigate and have a chance to speak to

6   my client more in depth.

7        He hasn't had a chance to review the audio tape that

8   was turned over yesterday.

9        THE COURT:  What audio tape?

10       MR. KAMDANG:  The one piece of 3500 material that

11   was turned obvious was an audio-taped interview with

12   Ms. Hyatt, and that's what we got at 5:30 last night, and

13   that's what I heard last night for the first time.

14       THE COURT:  When is she testifying.

15       MR. AMATRUDA:  We were going to put her on at the

16   end of our case, Judge.

17       THE COURT:  So, we're going to have, we could have

18   at least the weekend before she testifies.

19       MR. KAMDANG:  Your Honor, if we're talking about

20   doing the trial next week, I can prepare for that.

21       THE COURT:  Well, I don't know what we're talking

22   about.

23       MR. KAMDANG:  If we're talking about doing the trial

24   this afternoon or tomorrow --

25       THE COURT:  Well, but she's not going to testify --

Proceedings                                    38

1   she won't testify this week, in any event, I guess as late as

2   we're going now; correct?  If I don't sit on Friday.

3           MR. KAMDANG:  I mean, we always talked about all the

4   testimony coming in, in one day.  So, if we start the trial

5   this afternoon, she'll be on the stand tomorrow.

6           THE COURT:  Is that right?

7           MR. AMATRUDA:  I think so, Judge.

8           I would say, though, that as far as the 3500

9   material goes, Mr. Kamdang is right that we did not make that

10  available, because there's a very specific reason we didn't;

11  and there's evidence in this case of witness tampering.

12          And in addition, Mr. Taylor happens to know an awful

13  lot about this witness and I have very real concerns about

14  both her safety and about witness tampering.  And we do not

15  have to turn over 3500 material.  I believe that our notice --

16  until after the witness testifies.  And I believe that our

17  notice did provide Mr. Kamdang with enough information to

18  understand what the charges were, what we were going into and

19  to speak with his client about it.

20          MR. STERN:  Judge, could I just ask in all of this,

21  it's not really anything to do with what the parties here are

22  talking about, but about scheduling?

23          The one thing I don't think we should do in a very

24  short case is put in evidence half of today and tomorrow,

25  assuming that could happen, and then sum up on Monday.  It

Proceedings                                    39

1   seems like if we're going to do this, my preference -- and

2   obviously it's up to Your Honor what we do -- is to do the

3   case two days in a row, a Monday and a Tuesday.  Because I

4   don't think, if we start today, even if they get Mr. Pughe

5   here, we're going to be able to do the case in two days.  We

6   need two full days for this case, I think.

7           I read the transcript of Ms. Wright's trial.  It

8   seems to me that was exactly two full days, I think.  The

9   second day was 5:30.  So, I say that all only because as this

10  conversation goes on, it seems clear that we're not going to

11  finish today and tomorrow.  And that being the case, I prefer

12  to do it Monday and Tuesday.  I know that doesn't resolve this

13  discussion.

14          THE COURT:  All right, the warden's on the line.  I

15  apparently can't be transferred.  I'll come back and tell you.

16          (Recess taken.)

17

18          (Continued on following page.)

19

20

21

22

23

24

25

Proceedings                    40

1      (In open court.)

2      (Judge Amon takes the bench.)

3      THE COURT:  I spoke to the warden who said that they

4  can't release him today.  So he's going to call me back and

5  ask about Monday.  At which point, I'll just bring the jury

6  out.  If he says Monday, I'll bring the jury out and ask if he

7  can come back on Monday.

8      MR. STERN:  Can you bring the jury out without my

9  presence?

10     THE COURT:  You want me talking to the jury without

11  counsel present?

12     MR. STERN:  Yes.  Just ask if they can come back

13  Monday.

14     THE COURT:  But I'm probably going to hear things

15  about I have a problem and this one's got a problem and all

16  that.  We'll going to have to evaluate.

17     MR. STERN:  Well, I guess I'd like you to explain to

18  them that he's not here because he's ill.  I know he may not

19  personally be ill, but it's an easier way to deal with it than

20  the quarantine.

21     MS. AMATRUDA:  I don't know how Mr. Kamdang feels,

22  but we could have just the lawyers here, and you can explain

23  to the jury that we're just having a meeting with the lawyers

24  because of scheduling.

25     MR. STERN:  That's fine with me.

Proceedings                                    41

1          MS. AMATRUDA:  I don't know how Mr. Kamdang feels.

2          MR. KAMDANG:  I don't have a problem with that.

3          THE COURT:  Pardon me?

4          MR. KAMDANG:  I don't have a problem with that.

5          THE COURT:  Okay.

6          Is there anything we need to take up before, because

7   if it starts on Monday that solves your problem?

8          MR. KAMDANG:  I understand.

9          One more small issue.  At the suppression hearing we

10  had talked about the fact that Mr. Taylor's a/k/a is also

11  "Anthony Watts."  Mr. Amatruda has indicated that he's not

12  going to bring up "Anthony Watts" at all.

13         MS. AMATRUDA:  That's true.

14         THE COURT:  Okay.

15         MR. KAMDANG:  I just want to put that on the record.

16         And on that score, when the indictment goes back to

17  the jury, we'd ask that they redact the a/k/a.

18         THE COURT:  That's not a problem.

19         THE CLERK:  And the jury charge.

20         THE COURT:  Is it a/k/a in the jury charge?

21         THE CLERK:  It's exactly as in the caption.

22         MR. STERN:  There's other issues about Mr. Pughe.

23  Did you want to bring the jury out first before we resolve

24  them?

25         THE COURT:  No, I have to hear if he can come back

Proceedings                                42

1   Monday or not.

2         MR. STERN:  One of the things the Government asked

3   to do was to put in conversations which Mr. Pughe has, I

4   think, with Miss Jones, but I'm not positive about that, in

5   which they talk about laying low and going on run to

6   Tennessee.  I think that's related to the warrant, and I think

7   the Government agrees that that running has nothing to do with

8   this conspiracy but is running from the gun case in which he

9   pled, and I think it's related to your Honor's ruling that the

10  warrant can't come out.

11        THE COURT:  I don't see that there should be any

12  testimony about "laying low" or "on the run" or any of that.

13        MR. STERN:  And the final issue was the fact that

14  Mr. Pughe, the Government says, had no money when he arrived

15  and that that proves that he intended to sell drugs.

16        To me, poor people sometimes have no money, and that

17  doesn't prove that they intend to sell drugs.  Whether he was

18  in New York with no money or Tennessee with no money, it's

19  just a way of saying he's poor and, therefore, he must be

20  going to sell drugs whether they have proof that he's part of

21  this conspiracy or not, but the fact that he has no money

22  doesn't prove anything, particularly in an age when people go

23  to banks to get money and he happens to have family in the

24  south.

25        MS. AMATRUDA:  Your Honor, I think that taken in

Proceedings                                    43

1   isolation, obviously, there's a problem with the argument that

2   because someone's poor they're selling drugs.  I have no

3   quibble with that, but I do think that conspiracy cases you're

4   looking at the circumstances under which actions happen and

5   this is one part of the circumstances, along with his arrival

6   with a bus ticket in someone else's name and just not having

7   much possessions.

8            THE COURT:  Well, what are you going to argue about

9   it?

10           MS. AMATRUDA:  Well, just that certainly it goes to

11  his motive for being there.  If he doesn't have money, he has

12  to do something for money, and that's part of motive.

13           And again, I think that Mr. Stern could make a very

14  articulate argument.

15           THE COURT:  Well, how are you going to prove it,

16  just that he was searched and he didn't have any money on him?

17           MS. AMATRUDA:  Yeah, that's all.

18           MR. STERN:  The fact that he doesn't have money goes

19  to any number of ways to make money.  He could get a job in

20  Tennessee.  He could sell drugs in Tennessee.  He could rob a

21  bank in Tennessee.

22           What the Government says somehow proves anything

23  other than this conspiracy just doesn't make sense.  If he had

24  money, then they'd say well, he must have taken money he was

25  given by Mr. Taylor and come down here as part of the

Proceedings                                    44

1   conspiracy if he had money since he just got out of jail.

2   Either way he can't win, and it's not really an argument that

3   is related in any way to the evidence in this case.  It's just

4   an argument --

5           THE COURT:  Look, they can prove the fact that he

6   was arrested and searched and they found no cash on him.  What

7   they argue from that later on, you know, I don't know whether

8   it's a strong argument or not an argument, but I don't see

9   anything particularly prejudicial about proving that when he

10  was arrested he had no cash on him.  They can prove that.

11          MR. STERN:  They can prove that.  I really am,

12  you're right to say, concerned about the argument they intend

13  to make from it.

14          THE COURT:  Well, we can talk about that later.

15          MS. AMATRUDA:  Judge, and as long as we're waiting,

16  while we're waiting here, I do want to raise one issue and

17  that again revisits the issue of the witness that we're going

18  to call here.

19          I just want to put Mr. Taylor on notice that the

20  Government intends to take very seriously any attempts to

21  tamper with Miss Hyatt's testimony.  And I also want to put

22  Mr. Taylor on notice that, and this is not a threat, I'm just

23  putting him on notice of the fact that while witness tampering

24  charges may not effectively do much as far as the amount of

25  time he serves, he is a three-time drug felon which exposes

Proceedings                                        45

1   him to a mandatory life sentence, and the Government is going

2   to take very seriously any attempt that's improper to tamper

3   with any witness in our case, and I just need to make a record

4   of that.

5            THE COURT:  I've got a call from the warden.

6            (Recess taken.)

7

8            (In open court.)

9            THE COURT:  The warden said that he thought Monday

10  was a good bet as long as he doesn't come down with chicken

11  pox.

12           MR. STERN:  Did they say if he had it or not?

13           THE COURT:  They're going to take blood tests to see

14  if he's had it.  They don't know.

15           MR. KAMDANG:  Does that mean he hasn't had chicken

16  pox?

17           MR. STERN:  I guess they don't know.

18           THE COURT:  They don't know if he's had chicken pox.

19  He didn't know.  They will know by Friday.

20           MR. KAMDANG:  Your Honor, I'm sorry.  There's so

21  many moving parts to this that you might have said already

22  what your ruling was.  Two other things that I wasn't sure

23  about.

24           I understand your Honor's ruling on the wire

25  transfers to Belinda Jones.

```
                        Proceedings                    46
```

 1        THE COURT:  Right.

 2        MR. KAMDANG:  The other wire transfers that the

 3   Government was seeking to admit, has your Honor ruled on that?

 4        And the second issue is the razor blade.

 5        THE COURT:  Let's deal with the jury since I'm going

 6   to have to let them go.

 7        MR. KAMDANG:  Sure.

 8        MR. STERN:  There's also the issue of our objections

 9   to part of Agent Hammonds' testimony.

10        THE COURT:  I don't think Agent Hammonds ought to be

11   able to testify about the mission of his unit or the success

12   in identifying local transfers.  That shouldn't come in.

13        MR. STERN:  Thank you.

14        THE COURT:  Who had the razor blade?  Mr. Pughe had

15   the razor blade?

16        MR. KAMDANG:  I just want to know what we're working

17   with.

18        THE COURT:  Is somebody moving to exclude the razor

19   blade?

20        MR. KAMDANG:  I thought Mr. Stern had.

21        THE COURT:  No.

22        MR. KAMDANG:  Then I apologize.

23        THE COURT:  Mr. Taylor, we're going do bring the

24   jury out, and it's okay with you that you're not here when the

25   jury comes out?

```
                        Proceedings                    47
```

1           THE DEFENDANT:  It's all right.

2           THE COURT:  All right.  Do you want to bring them

3    out?

4           (Defendant Taylor exits the courtroom.)

5           (Pause in the proceedings.)

6

7           MS. AMATRUDA:  Judge, before the jury comes out, I

8    just learned that one of my witnesses has vacation plans

9    beginning Friday.  He is going to be, I guess, in Florida.  He

10   says he may have to pay a penalty.  He's trying to see if he

11   can change them, but he may have to pay a penalty if he tries

12   to cancel.  It's Agent Hammonds, so his testimony is fairly

13   central to the case.

14          THE COURT:  Well, what's the stimulus package for?

15          Have him pay the penalty.  Really.  Somebody take

16   care of it for him.

17          MS. AMATRUDA:  Okay, judge.

18          (Pause in the proceedings.)

19

20          (Continued on following page.)

21

22

23

24

25

Proceedings                                      48

1              (Jury enters the courtroom.)

2              (The following occurred in the presence of the

3    jury.)

4              THE COURT:  All right.  Good morning, ladies and

5    gentlemen.  Please be seated.

6              I'm Judge Amon, and I will be presiding over the

7    trial of this case.

8              I'm sorry to have kept you back there waiting for so

9    much time, but we were trying to get additional information so

10   that I could give you information about how we're going to

11   proceed.  We're here, as you know, with just the attorneys

12   this morning.

13             One of the parties to the case is ill, and what I've

14   been trying to determine is to get a reasonable picture of

15   when the person would be able to come back.  It's a very

16   unforeseen circumstance.  No one knew about this before this

17   morning.  Otherwise you would have all been contacted.

18             So what I've been trying to ascertain for the couple

19   of hours that you all have been back there is when we can

20   reasonably anticipate that this person will be able to proceed

21   with the case, and the medical information that I have

22   obtained has suggested that Monday the party will be

23   available.  So it would be my intention then to resume the

24   case next Monday.

25             The parties have not anticipated that this is going

Proceedings                                    49

1   to be a lengthy matter to begin with, I think perhaps around

2   three days hopefully.  So it's not going to be a lengthy

3   trial, but it's really a matter that's beyond our control.

4            So that's what my plan would be to do is to have all

5   of you return on Monday morning.

6            Okay?

7            Yes, ma'am?   Do you want to come over here, and let

8   me just talk to you.

9            (Sidebar.)

10           (Continued on next page.)

```
                              Sidebar                          50
```

1          (Side-bar conference held on the record out of the

2     hearing of the jury.)

3          JUROR NO. 5:  Yes, my daughter-in-law just had a

4     baby last night.  I was supposed -- I told her it was the 22nd

5     she was due, but it happened she made the baby, and I was

6     supposed to be with her in Atlanta.  So my son was asking me

7     this morning, "Mommy, when are you coming?"  I said, "I have

8     to go today to court."  So now --

9          THE COURT:  Can you go down now and come back on

10    Monday?  Can you go down and spend this time, it's Wednesday

11    through the whole Sunday?

12         JUROR NO. 5:  They wanted me to spend two weeks with

13    her.  This is the first baby.  She have a five pound eleven

14    month baby.

15         THE COURT:  Congratulations.

16         JUROR NO. 5:  So, I mean, I tell him, "Well, I see

17    what could happen and I can come Monday if the case last two

18    days," but now this is really taking me.

19         THE COURT:  Okay.  Well, why don't we do this.  Why

20    don't you call Miss Holley on Friday and we'll find out and

21    then we'll advise you on Friday.

22         JUROR NO. 5:  Okay.

23         THE COURT:  Would you want to go down now?

24         JUROR NO. 5:  No.

25         THE COURT:  Knowing that it's not going to go this

Sidebar                                        51

1    week.

2             When did you anticipate going down?

3             JUROR NO. 5:  On Monday because I thought maybe --

4             THE COURT:  So your current plans were to go on

5    Monday?

6             JUROR NO. 5:  Yes.

7             THE COURT:  Call Miss Holley on Friday, and she'll

8    tell you what to do.

9             JUROR NO. 5:  Thank you, very much.

10            THE COURT:  We'll just see what happens.

11            JUROR NO. 5:  Okay.

12            (Sidebar end.)

13            (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    52

1          (In open court.)

2          THE COURT:  Is there someone else who needed to

3   speak to me?

4          All right.  Juror Number 3.

5          (Sidebar.)

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                    53

1           (Side-bar conference held on the record out of the

2    hearing of the jury.)

3           THE COURT:  Yes.

4           JUROR NO. 3:  Hi.  I'm a elementary school teacher,

5    and next week is my last week of school.  So I have to give

6    out report cards and pack up my classroom.

7           THE COURT:  Can you work on that this week then

8    since you can go back this week?

9           JUROR NO. 3:  I mean, as long as, 'cause Friday's

10   the last day next week.  So as long as I can be there by

11   Friday to hand out the report cards.

12          THE COURT:  I don't think that should be a problem.

13          MR. KAMDANG:  Yeah.

14          MS. AMATRUDA:  No, it shouldn't.

15          JUROR NO. 3:  Thank you.

16          (Sidebar end.)

17          (Continued on following page.)

18

19

20

21

22

23

24

25

Proceedings                                    54

1          (In open court.)

2          THE COURT:  Someone else had their hand raised?

3          Yes, foreperson.

4          (Sidebar.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                          55

 1          (Side-bar conference held on the record out of the

 2   hearing of the jury.)

 3          JUROR NO. 1:  Hi.  It's not a problem, but I have a

 4   summons for Supreme Court for jury duty Monday.

 5          THE COURT:  Well, can you just give that to my

 6   courtroom deputy, and we'll take care of that?

 7          JUROR NO. 1:  I didn't bring it with me today.

 8          THE COURT:  Bring it on Monday.  We'll take care of

 9   it.

10          (Sidebar end.)

11          (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                    56

1          (In open court.)

2          THE COURT:  Yes, ma'am.

3          (Sidebar.)

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              Sidebar                          57
```

1          (Side-bar conference held on the record out of the

2     hearing of the jury.)

3          THE COURT:  Yes, ma'am.

4          JUROR NO. 11:  My name is Duijin Chen.  I'm a

5     volunteer in senior center.  I have a show on next Tuesday and

6     Thursday, and I have to go to show on next Wednesday.  That's

7     why I couldn't come on this three days.  Otherwise, I would go

8     to -- I have a trip on June the 4th.

9          THE COURT:  July 4th?

10         JUROR NO. 11:  Yes.

11         THE COURT:  Well, it won't be a problem with your

12    trip, but next week we would need you Monday, Tuesday and

13    Wednesday, possibly Thursday.  We'd need you to be here.

14         Can you rearrange those matters?

15         JUROR NO. 11:  No, because -- because I need to go

16    to that -- take part in that show.  There is a show at the

17    center, senior center.

18         THE COURT:  Why do you have to do it?  Can't

19    someone take care of it for you?

20         JUROR NO. 11:  Because I have to perform in that.

21         THE COURT:  Well, give Miss Holley your number, and

22    she'll contact you Friday and let you know whether you have to

23    be here or not.

24         JUROR NO. 11:  Okay.  Friday?

25         THE COURT:  Yes.  You'll connect on Friday, and

```
                      Sidebar                          58
```

1    she'll speak to you.

2              JUROR NO. 11:  Okay.  Talk to some?

3              I call you?

4              COURTROOM DEPUTY:  No, not now.  Take your seat and

5    I'll talk to you in the back.

6              (Sidebar end.)

7              (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          59

1          (In open court.)

2          (Alternate Juror No. 4 approaches sidebar.)

3

4          (Sidebar.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                          60
```

1          (Side-bar conference held on the record out of the

2    hearing of the jury.)

3          ALTERNATE JUROR NO. 4:  I think I already told the

4    other judge that I'll be travelling out of the country

5    starting the coming Sunday.

6          THE COURT:  This coming Sunday?

7          ALTERNATE JUROR NO. 4:  Yes.  I won't be back until

8    the following Sunday.

9          THE COURT:  Where are you going?

10         ALTERNATE JUROR NO. 4:  Bermuda on a cruise.

11         THE COURT:  Have you already got your tickets for

12   it?

13         ALTERNATE JUROR NO. 4:  Yeah, 'cause I can only make

14   it this week.

15         THE COURT:  So you're going all of next week?

16         ALTERNATE JUROR NO. 4:  Yeah, whole week next week,

17   seven days.

18         THE COURT:  Miss Holley will take your number and

19   get in touch with you on Friday and let you know.

20         So Miss Holley, you'll meet with these people in the

21   back?

22         MR. KAMDANG:  Judge, just for the record, when we

23   picked this alternate juror, Judge Mann assured him that if

24   the trial went to Sunday that he would be allowed not to come

25   back.

```
                        Sidebar                         61

1           THE COURT:  Bottom line is who knows if this fellow

2   is not going to have the chicken pox on Friday, if we need to

3   put this over another week.

4           MR. STERN:  But this guy in particular was told he

5   wouldn't have to.

6           MS. AMATRUDA:  Yeah.

7           (Sidebar end.)

8           (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                     62

1          (In open court.)

2          THE COURT:  All right, ladies and gentlemen.  My

3    courtroom deputy will talk to you in the back, and I've talked

4    to several of you about further contact, and we'll begin on

5    Monday.

6          Thank you, very much, and I'm sorry for the delay.

7    It's just unavoidable.

8

9          (Jury exits the courtroom.)

10

11          (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    63

1              (The following occurred outside the presence of the

2      jury.)

3              THE COURT:  All right.  I think the other issue we

4      were talking about was other wire transfers apart from those

5      to Miss Jones.

6              What are the relevance of the other wire transfers?

7              MS. AMATRUDA:  Well, judge, the Government's theory

8      is that, again, based on a foundation that we intend to

9      develop at trial, at the time these wire transfers were

10     sent --

11             MR. KAMDANG:  I'm sorry, your Honor.  Can we bring

12     my client back out?

13             MS. AMATRUDA:  I'm sorry.

14             THE COURT:  All right.  Is he there?

15             (Pause in the proceedings.)

16

17             (Defendant Taylor enters the courtroom.)

18             MR. STERN:  Judge, I'm also go to ask your

19     permission to get the minutes.  I think that Mr. Kamdang is

20     getting them on an immediate basis.  Whatever basis he's

21     getting, I'd like to get them.  We'll split, if that's all

22     right.

23             THE COURT:  All right.

24             MR. STERN:  Thank you.

25             MS. AMATRUDA:  Judge, I think first of all, just

Proceedings                                    64

1    maybe, I apologize for not doing this earlier.  What may be

2    helpful to everybody is at least right now, and I hope I won't

3    get pigeonholed for saying this, but my good faith belief is

4    this is the way we're going to put on our case.  We're going

5    to call the agents and testify.  There's going to be four of

6    them.  They're basically the same agents that we've all heard

7    from already.  Then we're intending to call Miss Hyatt.  Once

8    Miss Hyatt is done with her testimony, we were intending to

9    introduce some of the evidence in the case that I've discussed

10   with defense counsel, and that would include the wire

11   transfers, some phone records, as well as the phone calls that

12   we had recorded.

13          So I think by that time, I would anticipate that

14   these objections are really not going to be very debatable.

15   But not to dismiss them entirely, I'll tell your Honor that

16   our theory of admission of the wire transfers is that during

17   this time period, again the question is going to arise what

18   did the defendant do with this money he was earning selling

19   drugs.  And this witness will testify, I believe, that she

20   accompanied him at times to send wire transfers to New York

21   City to his family and these wire transfers are during the

22   time period of the conspiracy and they're from Tennessee to

23   Brooklyn, New York.

24          I think in addition to being in furtherance of the

25   conspiracy, showing what the defendant was doing with the

Proceedings                                                    65

1   money, which is relevant, they also help us to further

2   establish venue in the case.

3           THE COURT:  All right.  Anything else we need to

4   take up?

5           MR. STERN:  There is one other issue.

6           If I were on trial by myself, by which I mean

7   without Mr. Taylor, I would object to the Government bringing

8   out the reasons for surveilling the bus station, and I think,

9   I've spoken with Mr. Amatruda about it and he agreed that were

10  that my position, we would find a way to resolve it.

11          The problem from my perspective is that I think Mr.

12  Kamdang feels differently about it, and he has his own

13  tactical reasons.  I don't mean to suggest that they're good

14  or bad.  And based on that, while I recognize it's tactical, I

15  would move for a severance because I think it's going to

16  prejudice my client that information is going to come out

17  through cross-examination that the police were looking for

18  someone bringing drugs in from outside the city and the person

19  they focus on is Mr. Pughe.

20          THE COURT:  Who wants to bring that out?

21          MR. STERN:  I think Mr. Kamdang.

22          THE COURT:  Why?

23          MR. KAMDANG:  Your Honor, I'm just not --

24          THE COURT:  Why is it relevant?

25          MR. KAMDANG:  Well, I have to cross the police

Proceedings                                      66

1    officers on their credibility, and any cross that I've

2    designed, for example all of these moves that these illegal

3    traffic maneuvers, the police didn't stop them at all, and if

4    I am to question the officers about why they didn't stop them

5    after speeding off or stopping in the middle of the street or

6    making an illegal U-turn, there's no way that they shouldn't

7    be able to say that the reason why they were there was because

8    of a reliable confidential informant.

9             I'd also like to explore the veracity of that, and

10   our position is even the tip about the confidential informant

11   isn't truthful and we would challenge if that's their basis

12   for being there.

13            Basically at this point, we're leaving everything on

14   the table, and we're not conceding any of the police officers'

15   story, and it all goes to their credibility.

16            MR. STERN:  The reason this is an issue for me is

17   without that information, the evidence in this case will be

18   that my client arrives in Tennessee, gets in the backseat of a

19   car with a bag.  The car, not driven by him, makes various

20   traffic maneuvers, whatever they are.  He's been in Tennessee

21   for 20 minutes when the car is stopped.  He cooperates with

22   every single thing he's asked to do.  He has no drugs on him,

23   and the only thing he has is a razor blade that the Government

24   says is used for cutting up crack.  It's probably the weakest

25   federal case I've ever had, and the fact that the police are

Proceedings                                          67

1   looking for someone bringing in, as it turns out, OxyContin

2   from out of the state, really from Detroit is their

3   information, while my client is clearly coming from New York,

4   complicates the case in this way.  If it comes out at all, I

5   have to cross-examine the police to show that my client was

6   not that person, and there's many, many ways to show that.

7              THE COURT:  Well, they'll admit it.

8              MR. STERN:  They'll admit it, but the reason they

9   focus on him at all is, from its inception, a mistake.  I

10  don't have to go through the whole cross.  We all know from

11  the hearings that there's many reasons.  It's clear they were

12  wrong from the beginning, not just as it turns out wrong, but

13  wrong from the beginning.

14             It changes the whole case for me from what is really

15  a very basic case.  I think the Government agrees that the

16  witness they're calling, who they say is a friend of Mr.

17  Taylor's, doesn't know Mr. Pughe from Adam.  There's no one

18  who's going to say beyond this money order.  So it's a very

19  simple case or a not so simple case, and it's made not so

20  simple, and I say this not to blame anyone, because Mr.

21  Kamdang has different interests in this case than I do and

22  different tactical approaches to the case for what are very

23  good reasons, I think, but I don't want to be prejudiced by

24  his tactical choices.

25             THE COURT:  I don't actually see how you are

Proceedings                                68

1   prejudiced other than you say that it lengthens the trial

2   because he's cross-examining about a lot of stuff that you

3   think otherwise wouldn't be necessary.

4        The only prejudice that you're articulating is that

5   you're here about, you know, ten minutes longer than you

6   should be and it's not as clean as you would like to see it,

7   but once the bottom line will be established through these

8   officers and they'll concede that they don't believe the

9   information they had pertained to Pughe, then I don't see what

10  the prejudice is.

11       If the whole supposition would be 'yeah, Pughe was

12  the guy we were looking for' and you get a lot of hearsay that

13  somehow is identifying Pughe as a bad guy, I would understand

14  your problem, but once we get to the bottom line that Pughe is

15  not who they were looking for, and they'll say that, I don't

16  understand what the prejudice is.

17       MR. STERN:  The prejudice is is that it sets up the

18  idea that there's a pattern of people bringing drugs into

19  Kingsport, Tennessee from outside Kingsport, Tennessee and

20  that's their reason to be at the bus station watching and

21  that's their reason to focus on Mr. Pughe, and I then am in a

22  position of having to cross-examine them about all of the I'm

23  going to say mistakes, I say that loosely, but all of the

24  inconsistencies between what they knew and who Mr. Pughe

25  really was.  It's an area I wouldn't touch at all were I not

Proceedings                                          69

1    on trial with Mr. Kamdang.

2         THE COURT:  But it can be dealt with by one

3    question: "Did you come to a determination that Mr. Pughe was

4    not the person that you were looking for?"   Answer: "Yes."

5         MR. STERN:  I don't agree it can be dealt with in

6    one question because I think if it's tried that way, I am, I'm

7    going to say, obligated but I really mean tactically obligated

8    to show that the same reason Mr. Pughe is on trial and has

9    been charged with drugs when he's never in contact with them,

10   never holds them, never seen with them is the same reason they

11   focused on him, which is that people jump to conclusions that

12   are often wrong, and they jumped to a conclusion in this case

13   when they started following him solely because, in my opinion,

14   he was a black man at the bus station.

15        So I don't really agree with you that I can just say

16   "Isn't it true that Pughe wasn't the man?"  I think it's more

17   complex than that.

18        THE COURT:  Then, Mr. Stern, I'm confused because it

19   sounded like a moment ago that you wanted to use their mistake

20   to your advantage.

21        MR. STERN:  I don't want to use their mistake at

22   all.  If I were on trial by myself, the case would be tried.

23   The police were at the bus station.  They see Mr. Pughe get in

24   the car.  The car commits traffic infractions.  They stop the

25   car.  Mr. Pughe is compliant with everything they ask him to

Proceedings                                    70

1   do.  They find drugs near Miss Wright and in Miss Wright's

2   pants.  They find a scale in the front seat.  They look

3   through his bag.  They find nothing, and on the seat behind

4   Mr. Taylor is a bag of regular store baggies that are never

5   seen touching Mr. Pughe, held by Mr. Pughe, anything like

6   that.  That would be the case, and that's how I would try this

7   case, but once the door is open to all of this other what I'm

8   going to characterize as a mess, it changes the way I have to

9   try the case, and it changes to my client's detriment.

10          THE COURT:  Well, I don't think that it meets the

11  standard that would justify a severance.  It's certainly not

12  something of the nature of irreconcilable, you know, defenses

13  or anything like that.  It's merely a matter of strategy.

14  Although it might not be a perfect trial for you as you would

15  prefer it to be tried alone, those kinds of circumstances that

16  you've described seem to me to be fairly routine, that you

17  might not agree line-for-line with the strategy of co-counsel.

18          Ultimately there's no direct prejudice to your

19  client because it's not as if the information that they have

20  about a drug dealer coming in is somehow hearsay information

21  that's inuring to the detriment of your client because they

22  will come out and say, if asked, that the information in their

23  view did not pertain to Mr. Pughe, that he is not the one that

24  they were looking for.  Particularly there will not be any

25  prejudice because the Court has also ruled to the OxyContin

Proceedings                          71

1   doesn't come in.  It would be, I think, plainly more of a

2   problem if the OxyContin did come in, but anyway.

3          MR. STERN:  That being the case then, what I'd ask

4   is that the Government and we be limited to asking the

5   officers: "Were you there surveilling the bus station because

6   you had information someone was bringing in contraband?"  And

7   not that it was drugs, because there are drugs ultimately

8   found in the car, obviously.  I don't think that's in any

9   dispute there were drugs found in the car, but I don't think

10  the jury should be entitled to infer from that that maybe Mr.

11  Pughe brought drugs, even if they were wrong, and he somehow

12  transferred them in the car to the glove compartment,

13  something like that.  It seems to me it satisfies everyone's

14  needs, in light of your ruling, that they be limited to saying

15  'we were there surveilling the bus station because we had

16  information someone was bringing in contraband.'

17         MS. AMATRUDA:  Your Honor, I think the question is

18  actually more to Mr. Kamdang.  We're sort of willing to go

19  along with whatever resolution is reached.

20         MR. KAMDANG:  As I sit here, I don't think I'm

21  willing to give up the contradiction.

22         THE COURT:  You know, I'm not getting what the heart

23  of this big cross-examination is about from your perspective,

24  Mr. Kamdang.  That they were wrong about what they were doing?

25  Somehow you say this deals with credibility.

Proceedings                                          72

1        How are you going to be able, you think you'll be

2   able to make an argument to the jury that they were lying

3   about having informant information?

4        MR. KAMDANG:  At this point --

5        THE COURT:  And therefore, they're lying about where

6   they found the drugs in the car?

7        MR. KAMDANG:  At this point, I'm in a position where

8   I'm cataloging every inconsistency that I can find, and yes.

9        THE COURT:  What difference does it make whether

10  they had information that someone was bringing in OxyContin

11  versus information that they were bringing in contraband in

12  terms of the cross-examination or somehow undermining their

13  credibility?   What difference does it make?

14       MR. KAMDANG:  I mean, I suppose it doesn't in the

15  sense that they will freely admit that this is not the person

16  they were looking for.

17       THE COURT:  Why does that hurt their credibility?

18  I'm not getting the credibility issues here.

19       What are you trying to elicit that they're not going

20  to be credible about vis-a-vis the informant information that

21  they were looking for somebody bringing in drugs?

22       MR. KAMDANG:  Your Honor, at this point with the

23  evidence that Mr. Taylor is facing, I wish I could tell you

24  that I have a perfect defense theory.  I don't want to take

25  off the theory that he was completely framed for all of this,

Proceedings                    73

1    and if I can make that argument based on the contradictions

2    and that's the best argument that I have to go with, that's

3    the argument that I'm going to make.

4              THE COURT:  But what are the contradictions?

5              MR. KAMDANG:  Every contradiction in the testimony?

6              THE COURT:  What are the contradictions about the

7    fact that they were looking for somebody with contraband?

8              MR. KAMDANG:  Well, your Honor, I'm not --

9              THE COURT:  Do you want to argue to the jury that

10   they made this story up?

11             I'm not saying you can't do any of this.  I'm just

12   trying to think about to the extent Mr. Stern has a question

13   about it.

14             MR. KAMDANG:  I think currently that's something we

15   are seriously considering arguing, that they made up the

16   reliable informant to justify their being there for racial

17   profiling.

18             THE COURT:  But racial profiling, then what?

19             I'm going to tell the jury that the legitimacy of

20   the stop and the search is not their concern.

21             MR. KAMDANG:  That's fine.

22             THE COURT:  But then argue that for these same

23   reasons they were framing?

24             I mean, where do you go from there?

25             MR. KAMDANG:  Your Honor, the reasonable doubt

Proceedings                                          74

1    standard is that if there's something in the jury's case that

2    makes them hesitate and if for some reason they question the

3    fact that there are these issues in this case and it makes

4    them hesitate at the Government's case, then that is

5    reasonable doubt and they don't necessarily have to believe

6    that Mr. Taylor is -- that he didn't create this, but if that

7    creates that mere hesitation.

8              THE COURT:  If what creates the mere hesitation?

9              MR. KAMDANG:  The fact that if they are convinced

10   that these officers are not credible because they are

11   motivated by racial bias.  If that makes them hesitate in

12   evaluating the Government's case, then that would be a valid

13   reason for a juror to vote "not guilty."

14             Your Honor, I understand what the evidence in this

15   case is, but Mr. Taylor has a right to a vigorous defense, and

16   I intend to put one on.  It doesn't mean that simply Mr.

17   Taylor has no other recourse but to lie down in this case.

18             MS. AMATRUDA:  Judge, I would just add that I

19   understand Mr. Kamdang.  I don't think anybody's questioning,

20   obviously nobody's questioning his right to put on a defense

21   for his client, but the Government still hasn't heard anything

22   specific about the OxyContin that was supposedly when he

23   brought down that relates to racial bias, that relates to them

24   lying.

25             If the point Mr. Kamdang could be going towards is

Proceedings                                         75

1   that they said that they had an informant that brought

2   OxyContin and the OxyContin was a lie then you shouldn't

3   believe them, it doesn't seem any different that it's

4   OxyContin as opposed to contraband.

5          The point of the cross is whatever was being brought

6   is illegal and the agents are lying about the fact that they

7   received information that there would be illegal substances on

8   the bus.

9          MR. KAMDANG:  It doesn't have to be a racial thing.

10  If it's a situation that these officers have this information

11  that a certain drug is coming in and the arrest is made for a

12  wholly completely different drug, then that calls into

13  question the reliability of those officers' investigative

14  techniques because the tip was wrong.

15         MS. AMATRUDA:  What if the agents testified that

16  they got information about contraband and --

17         THE COURT:  Well, then I should put back the

18  OxyContin into the case?

19         MR. KAMDANG:  No.

20         THE COURT:  Well, hey, if you're going to be making

21  those kinds of arguments.

22         MR. KAMDANG:  Is the Government's theory that this

23  OxyContin came down from New York?

24         MS. AMATRUDA:  Judge, to be honest --

25         THE COURT:  No.

Proceedings                                76

1          MS. AMATRUDA:  -- I'm not seeking to go there.

2          Frankly, I could articulate reasons why I think

3     that's the case, but the Government charged a crack conspiracy

4     and we'll try a crack conspiracy.  That's fine.  I mean, I can

5     accept that.

6          So, I guess the point is I'm not saying -- I'm not

7     going to concede to Mr. Kamdang that I personally believe that

8     it wasn't what happened.  I'm just saying that the Government

9     is willing to not make it an issue in the case and not attempt

10    to put in evidence of that in the case.

11         THE COURT:  But again, Mr. Kamdang, returning to why

12    you need to prove that they'll say they had a tip that someone

13    was bringing in OxyContin as opposed to bringing in

14    contraband.

15         MR. KAMDANG:  Then the officers will testify that

16    this is a case about crack and we'll move on.  I don't think

17    that this is an intricate issue of anybody's case, but it is a

18    contradiction, and I just don't see why we should have to give

19    that up.

20         THE COURT:  Well, I suppose you could ask them that

21    the contraband that you were investigating wasn't crack, was

22    it.

23         MR. KAMDANG:  That's fine.

24         THE COURT:  That works, right?

25         MR. KAMDANG:  That's perfectly fine.

```
                        Proceedings                    77

 1           MR. STERN:  Okay with me.

 2           THE COURT:  Okay.

 3           MS. AMATRUDA:  We did it.

 4           THE COURT:  Any other issues that we need to take up

 5   before Monday?

 6           MR. STERN:  No.

 7           THE COURT:  All right.  We'll notify the parties if

 8   we hear about a positive chicken pox test on Friday.

 9           MS. AMATRUDA:  So, your Honor, I take it we'll hear

10   from chambers either way on Friday?

11           THE COURT:  Yes.  We'll let you know.

12           MS. AMATRUDA:  Thanks, judge.

13           THE COURT:  Okay.

14           (Defendant Taylor remanded.)

15

16           (Proceedings were adjourned at 11:38 a.m.)

17

18

19

20

21

22

23

24

25
```

**$**

**$30,000** [5] - 9:22; 10:1, 15, 22; 11:19
**$400** [1] - 19:16
**$7,000** [7] - 8:17, 22; 9:20; 11:1, 3-4; 12:15

**'**

**'we** [1] - 71:15
**'yeah** [1] - 68:11

**0**

**09-CR-00003(CBA** [1] - 1:3

**1**

**1** [2] - 55:3, 7
**100** [1] - 1:21
**10013** [1] - 1:22
**11** [6] - 57:4, 10, 15, 20, 24; 58:2
**11201** [2] - 1:17; 2:2
**11:38** [1] - 77:16
**16** [1] - 2:1
**16th** [1] - 21:5
**17** [1] - 1:7
**18th** [1] - 32:6
**19** [1] - 10:14
**1995** [1] - 10:13
**1st** [1] - 36:9

**2**

**20** [1] - 66:21
**2003** [2] - 10:10, 14
**2005** [2] - 10:10; 27:24
**2005-2006** [2] - 27:14; 29:22
**2006** [7] - 10:10; 11:7, 24; 28:5; 30:2; 32:3; 36:3
**2008** [10] - 10:11; 27:15; 28:7, 19; 32:6; 36:2, 7
**2009** [1] - 1:7
**21** [1] - 31:3
**22nd** [1] - 50:4
**271** [1] - 1:17
**29th** [1] - 5:9

**3**

**3** [4] - 52:4; 53:4, 9, 15
**3500** [5] - 36:16, 18; 37:10; 38:8, 15
**3rd** [1] - 2:2

**4**

**4** [6] - 59:2; 60:3, 7, 10, 13, 16
**40** [1] - 20:4
**404** [1] - 3:20
**404(b** [3] - 20:12; 32:21, 25
**404(b)** [2] - 20:10; 32:22

**4th** [2] - 57:8

**5**

**5** [9] - 50:3, 12, 16, 22, 24; 51:3, 6, 9, 11
**501** [1] - 1:21
**5:30** [3] - 36:19; 37:12; 39:9

**6**

**608** [2] - 20:8, 11
**613-2324** [1] - 2:21
**613-2607** [1] - 2:20
**646** [1] - 14:10
**646)** [1] - 14:12

**7**

**718** [2] - 2:20

**8**

**836-77** [1] - 14:11
**836-7700** [1] - 14:13
**8th** [3] - 36:11, 13

**9**

**90** [1] - 31:20
**9:30** [1] - 1:8

**A**

**a.m** [2] - 1:8; 77:16
**a/k/a** [3] - 41:10, 17, 20
**able** [9] - 29:23; 33:3; 39:5; 46:11; 48:15, 20; 66:7; 72:1
**absence** [1] - 7:4
**absolute** [1] - 6:3
**absolutely** [2] - 9:13; 31:14
**accept** [2] - 11:22; 76:5
**accompanied** [1] - 64:20
**accomplice** [1] - 27:3
**according** [2] - 23:25; 33:16
**accurate** [1] - 19:10
**actions** [1] - 43:4
**activities** [5] - 13:1; 28:9, 16, 22; 33:11
**activity** [1] - 32:15
**Adam** [1] - 67:17
**add** [1] - 74:18
**addition** [3] - 29:17; 38:12; 64:24
**additional** [1] - 48:9
**address** [1] - 17:25
**adjourned** [1] - 77:16
**adjournment** [1] - 35:6
**admissibility** [1] - 32:21
**admissible** [3] - 9:21; 19:9; 20:9
**admission** [2] - 11:10; 64:16
**admit** [8] - 30:7, 15; 33:11; 34:7; 46:3; 67:7; 72:15
**admitting** [3] - 22:3; 30:12; 33:10

**advance** [1] - 33:19
**advantage** [1] - 69:20
**advise** [1] - 50:21
**advises** [1] - 14:23
**afternoon** [2] - 37:24; 38:5
**age** [1] - 42:22
**Agent** [3] - 46:9; 47:12
**AGENT** [2] - 2:10; 15:19
**agents** [4] - 64:5; 75:6, 15
**ago** [2] - 36:15; 69:19
**agree** [3] - 69:5, 15; 70:17
**agreed** [2] - 18:25; 65:9
**agreement** [3] - 19:10, 20
**agrees** [2] - 42:7; 67:15
**ahead** [1] - 27:5
**aided** [1] - 2:23
**all-righty** [1] - 24:14
**allegations** [2] - 32:1
**alleged** [1] - 32:17
**alleging** [1] - 12:7
**allow** [2] - 21:10; 31:19
**allowed** [2] - 32:12; 60:24
**alone** [1] - 70:15
**alternate** [2] - 59:2; 60:23
**ALTERNATE** [5] - 60:3, 7, 10, 13, 16
**alternative** [1] - 20:10
**AMANDA** [1] - 2:3
**Amanda** [1] - 3:20
**AMATRUDA** [99] - 1:18; 3:8; 4:6, 19; 5:18; 6:2, 6, 8, 11; 8:19, 25; 9:9, 11, 16, 19, 23; 12:18; 13:15, 20, 25; 14:4, 10, 13, 15, 17; 15:20; 16:1; 17:1, 5, 7, 18; 18:3, 9, 12, 18, 20, 24; 20:2, 9, 18; 21:2, 8, 14, 18; 22:8, 14, 19, 22; 23:8; 24:3, 8, 17, 24; 25:10, 13; 26:3, 17, 22; 27:1, 7, 20; 30:22, 25; 31:3, 8, 14; 32:19, 24; 33:17, 25; 34:22, 25; 35:17; 36:11; 37:1, 15; 38:7; 40:21; 41:1, 13; 42:25; 43:10, 17; 44:15; 47:7, 17; 53:14; 61:6; 63:7, 13, 25; 71:17; 74:18; 75:15, 24; 76:1; 77:3, 9, 12
**Amatruda** [7] - 3:8; 4:3; 7:11; 16:25; 17:15; 41:11; 65:9
**AMERICA** [1] - 1:3
**Amon** [2] - 40:2; 48:6
**AMON** [1] - 1:12
**amount** [1] - 44:24
**ancillary** [1] - 32:14
**ANNA** [1] - 2:12
**answer** [4] - 4:23; 6:13, 18; 69:4
**Anthony** [2] - 41:11
**anticipate** [4] - 5:6; 48:20; 51:2; 64:13
**anticipated** [1] - 48:25
**anyway** [2] - 21:24; 71:2
**apart** [1] - 63:4
**apartment** [1] - 34:2
**apologize** [3] - 13:20; 46:22; 64:1
**appearance** [1] - 3:25
**appearances** [1] - 3:6
**applications** [1] - 10:7
**approaches** [2] - 59:2; 67:22
**appropriate** [1] - 18:14
**area** [1] - 68:25
**argue** [5] - 24:10; 43:8; 44:7; 73:9, 22
**arguing** [2] - 13:10; 73:15

**argument** [15] - 23:9; 24:11; 30:17; 43:1, 14; 44:2, 4, 8, 12; 72:2; 73:1
**arguments** [1] - 75:21
**arise** [2] - 8:1; 64:17
**arising** [1] - 8:4
**arrest** [5] - 7:25; 8:6, 17; 33:14; 75:11
**arrested** [8] - 20:5; 28:5; 30:2, 4, 21, 23; 44:6, 10
**arrival** [1] - 43:5
**arrived** [2] - 4:8; 42:14
**arrives** [1] - 66:18
**articulate** [2] - 43:14; 76:2
**articulating** [1] - 68:4
**ascertain** [1] - 48:18
**assist** [2] - 6:15
**Assistant** [1] - 1:18
**associates** [2] - 12:9; 35:23
**assume** [1] - 11:25
**assuming** [3] - 11:19; 19:9; 38:25
**assured** [1] - 60:23
**Atlanta** [1] - 50:6
**attempt** [2] - 45:2; 76:9
**attempted** [1] - 6:17
**attempts** [1] - 44:20
**Attorney** [2] - 1:16, 18
**attorneys** [1] - 48:11
**audio** [3] - 37:7, 9, 11
**audio-taped** [1] - 37:11
**availability** [1] - 4:25
**available** [3] - 5:15; 38:10; 48:23
**await** [1] - 20:24
**awaiting** [1] - 14:7
**aware** [4] - 9:2; 10:17; 24:18, 20
**awful** [1] - 38:12

## B

**baby** [4] - 50:4, 13
**background** [7] - 27:4; 30:19; 31:16, 20; 32:13, 22; 34:15
**backseat** [1] - 66:18
**bad** [3] - 24:1; 65:14; 68:13
**bag** [3] - 66:19; 70:3
**baggies** [1] - 70:4
**BAGLEY** [1] - 1:12
**bail** [1] - 33:14
**bailed** [2] - 34:5; 36:23
**bank** [1] - 43:21
**banks** [1] - 42:23
**bar** [5] - 50:1; 53:1; 55:1; 57:1; 60:1
**based** [9] - 9:12; 22:4; 29:7; 34:7, 10; 63:8; 65:14; 73:1
**basic** [1] - 67:15
**basis** [8] - 11:12; 12:1; 20:11; 23:22; 29:2; 30:16; 63:20; 66:11
**becomes** [1] - 31:21
**BEFORE** [1] - 1:12
**begin** [2] - 49:1; 62:4
**beginning** [3] - 47:9; 67:12
**begins** [1] - 31:22
**behalf** [1] - 3:19
**behind** [1] - 70:3
**belief** [1] - 64:3
**Belinda** [1] - 45:25

**bench** [1] - 40:2
**BENTON** [1] - 1:15
**Bermuda** [1] - 60:10
**best** [1] - 73:2
**bet** [1] - 45:10
**better** [1] - 6:21
**between** [5] - 22:25; 24:4; 32:6, 18; 68:24
**beyond** [2] - 49:3; 67:18
**bias** [2] - 74:11, 23
**big** [2] - 30:1; 71:23
**black** [1] - 69:14
**blade** [5] - 46:4, 14-15, 19; 66:23
**blame** [1] - 67:20
**blood** [1] - 45:13
**blustering** [1] - 23:15
**BOP** [1] - 6:22
**bottom** [3] - 61:1; 68:7, 14
**bracketed** [2] - 22:6, 15
**break** [1] - 26:24
**breaking** [1] - 26:21
**brief** [1] - 33:6
**bring** [13] - 12:10; 31:12; 40:5, 8; 41:12, 23; 46:23; 47:2; 55:7; 63:11; 65:20
**bringing** [11] - 65:7, 18; 67:1; 68:18; 71:6, 16; 72:10, 21; 76:13
**Brooklyn** [5] - 1:6, 17; 2:2; 18:17; 64:23
**brought** [4] - 71:11; 74:23; 75:1, 5
**bus** [11] - 13:4; 19:2, 5; 43:6; 65:8; 68:20; 69:14, 23; 71:5, 15; 75:8
**business** [3] - 18:7; 34:23; 35:4
**Butler** [2] - 2:19
**BY** [2] - 1:18, 22
**BY:LEN** [1] - 2:3

## C

**Cadman** [1] - 1:17
**CAMPBELL** [1] - 1:15
**cancel** [1] - 47:12
**caption** [1] - 41:21
**car** [18] - 10:2, 16; 20:15; 30:4-6; 32:5, 17; 66:19, 21; 69:24; 71:8, 12; 72:6
**cards** [2] - 53:6, 11
**care** [5] - 28:1; 47:16; 55:6, 8; 57:19
**CAROL** [1] - 1:12
**carrier** [1] - 16:5
**case** [69] - 4:13; 5:1; 8:11; 15:23; 20:1, 3, 20, 24; 21:24; 23:3, 6, 12, 16, 20, 25; 31:21; 32:4, 11-12, 14, 17; 33:8; 37:16; 38:11, 24; 39:3, 5-6, 11; 42:8; 44:3; 45:3; 47:13; 48:7, 13, 21, 24; 50:17; 64:4, 9; 65:2; 66:17, 25; 67:4, 14-15, 19, 21-22; 69:12, 22; 70:6, 9; 71:3; 74:1, 3-4, 12, 15, 17; 75:18; 76:3, 9-10, 16
**cases** [4] - 4:15; 43:3
**cash** [5] - 8:17; 10:2; 21:22; 44:6, 10
**cataloging** [1] - 72:8
**CAUSE** [1] - 1:12
**Center** [1] - 4:9
**center** [3] - 57:5, 17
**central** [1] - 47:13
**certain** [5] - 7:9; 18:16; 21:4; 26:3; 75:11
**certainly** [5] - 13:14; 18:12; 34:12;

43:10; 70:11
**challenge** [1] - 66:11
**chambers** [1] - 77:10
**chance** [3] - 21:9; 37:5, 7
**change** [1] - 47:11
**changes** [4] - 31:21; 67:14; 70:8
**character** [1] - 31:21
**characterize** [1] - 70:8
**characters** [1] - 35:18
**charge** [3] - 33:9; 41:19
**charged** [9] - 27:19, 22; 33:15, 21; 34:11; 35:16; 69:9; 76:3
**charges** [2] - 38:18; 44:24
**checking** [1] - 7:15
**Chen** [1] - 57:4
**chicken** [13] - 3:13; 4:5, 12; 14:24; 15:4, 7, 11, 13; 45:10, 15, 18; 61:2; 77:8
**choices** [1] - 67:24
**circumstance** [1] - 48:16
**circumstances** [5] - 9:21; 27:10; 43:4; 70:15
**City** [2] - 13:4; 64:21
**city** [1] - 65:18
**classroom** [1] - 53:6
**clean** [1] - 68:6
**clear** [5] - 20:6; 22:24; 26:25; 39:10; 67:11
**clearly** [1] - 67:3
**CLERK** [2] - 41:19, 21
**client** [13] - 7:4; 20:19; 36:23; 37:6; 38:19; 63:12; 65:16; 66:18; 67:3, 5; 70:19, 21; 74:21
**client's** [1] - 70:9
**co** [7] - 13:3; 20:3; 27:11; 28:15; 34:3, 10; 70:17
**co-conspirator** [2] - 13:3; 28:15
**co-conspirators** [3] - 27:11; 34:3, 10
**co-counsel** [1] - 70:17
**co-defendant's** [1] - 20:3
**cocaine** [2] - 20:14, 16
**coming** [10] - 19:19; 26:20; 33:24; 38:4; 50:7; 60:5; 67:3; 70:20; 75:11
**commits** [1] - 69:24
**compartment** [2] - 12:13; 71:12
**complaining** [1] - 33:14
**completely** [3] - 31:20; 72:25; 75:12
**complex** [1] - 69:17
**compliant** [1] - 69:25
**complicates** [1] - 67:4
**Computer** [1] - 2:23
**Computer-aided** [1] - 2:23
**computerized** [1] - 2:22
**concede** [2] - 68:8; 76:7
**conceded** [1] - 21:6
**concededly** [2] - 9:23; 10:20
**conceding** [1] - 66:14
**concern** [2] - 25:1; 73:20
**concerned** [1] - 44:12
**concerns** [1] - 38:13
**conclusion** [1] - 69:12
**conclusions** [1] - 69:11
**conduct** [1] - 30:13
**conference** [5] - 50:1; 53:1; 55:1; 57:1; 60:1
**confidential** [2] - 66:8, 10

**confirmation** [1] - 4:13
**confused** [1] - 69:18
**confusing** [1] - 27:9
**congratulations** [1] - 50:15
**connect** [1] - 57:25
**connected** [1] - 12:2
**connection** [1] - 12:14
**consent** [1] - 19:18
**consider** [1] - 22:3
**considering** [1] - 73:15
**consistently** [2] - 10:17; 12:23
**conspiracy** [36] - 8:10; 11:10, 20; 17:12; 18:8; 27:4, 19-20, 22; 29:10; 30:19; 31:16; 32:18; 33:9, 15, 21; 34:11, 13, 15; 35:3, 16, 20; 36:3; 42:8, 21; 43:3, 23; 44:1; 64:22, 25; 76:3
**conspiracy's** [1] - 27:16
**conspirator** [2] - 13:3; 28:15
**conspirators** [3] - 27:11; 34:3, 10
**constantly** [1] - 28:2
**contact** [5] - 11:11; 14:6; 57:22; 62:4; 69:9
**contacted** [1] - 48:17
**contacting** [1] - 6:22
**context** [2] - 26:25; 29:25
**continue** [1] - 28:23
**continued** [1] - 34:23
**Continued** [13] - 39:18; 47:20; 49:10; 51:13; 52:6; 53:17; 54:5; 55:11; 56:4; 58:7; 59:5; 61:8; 62:11
**continues** [1] - 28:20
**contraband** [8] - 71:6, 16; 72:11; 73:7; 75:4, 16; 76:14, 21
**contradiction** [3] - 71:21; 73:5; 76:18
**contradictions** [3] - 73:1, 4, 6
**control** [1] - 49:3
**conversation** [12] - 19:13; 24:15, 19, 23; 25:2, 24; 26:7, 13, 15; 39:10
**conversations** [13] - 8:20; 9:5; 21:5, 12, 17, 20; 22:9; 25:1, 4, 8; 26:23; 28:23; 42:3
**conviction** [1] - 19:24
**convinced** [1] - 74:9
**cooperates** [1] - 66:21
**core** [1] - 35:19
**correct** [18] - 4:6; 5:17; 9:16, 19; 14:15, 17; 16:1, 25; 18:18; 20:21; 21:17; 26:17; 27:21; 34:22, 25; 35:16; 36:10; 38:2
**Correction** [1] - 4:9
**correctly** [1] - 8:16
**Counsel** [4] - 3:6; 10:25; 24:19; 25:4
**counsel** [6] - 18:25; 26:11; 36:12; 40:11; 64:10; 70:17
**Counsel's** [2] - 21:9; 25:1
**country** [1] - 60:4
**couple** [3] - 27:5; 31:18; 48:18
**course** [3] - 4:2; 12:23; 18:8
**COURT** [200] - 1:1; 3:11, 15, 24; 4:3, 18, 24; 5:14, 21; 6:1, 5, 7, 25; 7:6, 12, 15, 18, 21; 8:23; 9:7, 10, 14, 17, 20; 10:25; 11:2; 12:15; 13:13, 16, 24; 14:1, 9, 12, 14, 16, 20; 15:8, 10, 13, 15, 17, 24; 16:2, 9, 11, 16, 19, 23; 17:2, 6, 14, 24; 18:4, 11, 14, 19, 22; 19:7, 15, 17, 23; 20:6, 12, 19, 22; 21:3, 12, 16; 22:5, 11, 17; 23:5,

11, 18, 23; 24:9, 14, 22; 25:9, 12; 26:15, 19, 23; 27:2, 19; 30:11, 23; 31:1, 6, 12, 15; 32:20; 33:13, 18; 34:14, 23; 35:5, 14; 36:6, 13, 16, 20, 24; 37:9, 14, 17, 21, 25; 38:6; 39:14; 40:3, 10, 14; 41:3, 5, 14, 18, 20, 25; 42:11; 43:8, 15; 44:5, 14; 45:5, 9, 13, 18; 46:1, 5, 10, 14, 18, 21, 23; 47:2, 14; 48:4; 50:9, 15, 19, 23, 25; 51:4, 7, 10; 52:2; 53:3, 7, 12; 54:2; 55:5, 8; 56:2; 57:3, 9, 11, 18, 21, 25; 60:6, 9, 11, 15, 18; 61:1; 62:2; 63:3, 14, 23; 65:3, 20, 22, 24; 67:7, 25; 69:2, 18; 70:10; 71:22; 72:5, 9, 17; 73:4, 6, 9, 18, 22; 74:8; 75:17, 20, 25; 76:11, 20, 24; 77:2, 4, 7, 11, 13
**Court** [5] - 2:1, 19-20; 55:4; 70:25
**court** [11] - 3:1; 4:17, 23; 40:1; 45:8; 50:8; 52:1; 54:1; 56:1; 59:1; 62:1
**Courthouse** [1] - 1:5
**courtroom** [9] - 3:23; 15:22; 16:12; 47:4; 48:1; 55:6; 62:3, 9; 63:17
**COURTROOM** [7] - 3:4, 16; 7:10, 13, 16, 19; 58:4
**crack** [9] - 20:4, 14, 16; 28:12; 66:24; 76:3, 16, 21
**create** [1] - 74:6
**creates** [2] - 74:7
**credibility** [6] - 66:1, 15; 71:25; 72:13, 17
**credible** [2] - 72:20; 74:10
**CRIMINAL** [1] - 1:12
**criminal** [1] - 30:13
**critical** [1] - 23:2
**cross** [12] - 20:11, 25; 65:17, 25; 66:1; 67:5, 10; 68:2, 22; 71:23; 72:12; 75:5
**cross-examination** [5] - 20:11, 25; 65:17; 71:23; 72:12
**cross-examine** [2] - 67:5; 68:22
**cross-examining** [1] - 68:2
**CRR** [1] - 2:19
**cruise** [1] - 60:10
**current** [1] - 51:4
**customers** [3] - 29:13; 35:3, 22
**cutting** [1] - 66:24

**D**

**DARIEN** [1] - 1:8
**Darien** [1] - 32:6
**date** [2] - 8:17; 12:16
**dated** [3] - 11:7; 21:5; 34:15
**daughter** [1] - 50:3
**daughter-in-law** [1] - 50:3
**DAVID** [1] - 1:22
**David** [1] - 3:12
**days** [10] - 5:8, 12; 39:3, 5-6, 8; 49:2; 50:18; 57:7; 60:17
**deal** [4] - 17:25; 30:20; 40:19; 46:5
**dealer** [1] - 70:20
**dealing** [5] - 9:18; 10:16; 12:23; 34:18
**dealings** [1] - 12:24
**deals** [4] - 18:4; 24:1; 71:25
**dealt** [2] - 69:2, 5
**debatable** [1] - 64:14
**DEFENDANT** [3] - 15:12, 14; 47:1

**defendant** [31] - 1:9; 4:17; 9:3; 10:1, 9; 13:3; 27:10, 23; 28:8, 10-11, 13-14, 16, 20; 29:2, 12; 30:1, 14, 18; 31:10, 17; 34:8, 17; 35:1; 47:4; 63:17; 64:18, 25; 77:14
**Defendant** [3] - 1:20; 2:1; 3:23
**defendant's** [8] - 12:23; 20:3; 21:22; 22:23; 28:5; 29:18; 31:9
**defendants** [2] - 7:24; 8:6
**DEFENDER** [1] - 2:1
**defending** [2] - 31:24; 36:4
**defense** [9] - 9:2; 15:18; 16:14; 18:25; 36:12; 64:10; 72:24; 74:15, 20
**defenses** [1] - 70:12
**delay** [1] - 62:6
**depth** [1] - 37:6
**DEPUTY** [7] - 3:4, 16; 7:10, 13, 16, 19; 58:4
**deputy** [2] - 55:6; 62:3
**Deputy** [2] - 6:19; 14:5
**described** [1] - 70:16
**designed** [1] - 66:2
**detained** [1] - 5:13
**determination** [1] - 69:3
**determine** [1] - 48:14
**detriment** [2] - 70:9, 21
**Detroit** [1] - 67:2
**develop** [2] - 20:24; 31:6; 63:9
**Dewayne** [2] - 3:19, 23
**DEWAYNE** [1] - 1:8
**difference** [2] - 72:9, 13
**different** [9] - 23:19; 24:7; 26:13; 30:11; 35:19; 67:21; 75:3, 12
**differently** [1] - 65:12
**differs** [1] - 12:6
**difficult** [1] - 30:8
**direct** [6] - 10:21; 12:3; 27:17; 29:19, 21; 70:18
**directly** [2] - 9:8; 20:14
**discovery** [1] - 11:20; 35:24
**discuss** [1] - 12:25
**discussed** [4] - 35:13, 15, 21; 64:9
**discussing** [2] - 3:25; 35:12
**discussion** [2] - 9:25; 39:13
**dismiss** [1] - 64:15
**dispute** [2] - 26:10; 71:9
**district** [1] - 31:5
**DISTRICT** [3] - 1:1, 13
**District** [2] - 1:16; 6:20
**dog** [1] - 31:22
**dollars** [1] - 10:3
**don't..** [1] - 26:14
**done** [2] - 18:8; 64:8
**door** [1] - 70:7
**doubt** [2] - 73:25; 74:5
**down** [17] - 12:10; 22:24; 24:4; 25:19; 26:1, 18; 43:25; 45:10; 50:9, 23; 51:2; 74:17, 23; 75:23
**driven** [1] - 66:19
**drug** [16] - 9:18; 10:19; 12:5, 25; 24:1; 27:25; 28:4, 16-17; 34:18; 44:25; 70:20; 75:11
**drug-dealing** [2] - 34:18
**drug-selling** [1] - 28:17
**drugs** [31] - 9:13; 10:16; 12:10, 13;

13:4; 23:9; 24:5; 27:24; 29:16; 30:4, 6; 34:3; 42:15, 17, 20; 43:2, 20; 64:19; 65:18; 66:22; 68:18; 69:9; 70:1; 71:7, 9, 11; 72:6, 21

**due** [1] - 50:5
**Duijin** [1] - 57:4
**Duke** [1] - 14:6
**during** [18] - 9:4, 25; 10:11; 11:13, 16; 17:12; 18:8; 27:16; 28:17; 29:21, 23-24; 31:10; 34:11, 18; 64:16, 21
**duty** [1] - 55:4

## E

**E-mail** [1] - 2:21
**early** [1] - 28:7
**earning** [1] - 64:18
**easier** [1] - 40:19
**East** [1] - 1:17
**EASTERN** [1] - 1:1
**Eastern** [2] - 1:16; 6:20
**effect** [1] - 34:19
**effectively** [2] - 4:16; 44:24
**either** [4] - 3:13; 21:25; 44:2; 77:10
**element** [1] - 23:2
**elementary** [1] - 53:4
**eleven** [2] - 35:12; 50:13
**elicit** [4] - 29:18, 20; 31:13; 72:19
**eliciting** [1] - 8:6
**employment** [2] - 11:12; 16:18
**end** [8] - 21:24; 23:3; 37:16; 51:12; 53:16; 55:10; 58:6; 61:7
**ended** [1] - 31:10
**engaged** [1] - 34:19
**enterprise** [1] - 11:23
**enters** [3] - 3:23; 48:1; 63:17
**entire** [3] - 10:8; 27:17; 31:22
**entirely** [3] - 13:9; 18:12; 64:15
**entitled** [2] - 33:19; 71:10
**especially** [1] - 19:1
**ESQ** [4] - 1:15, 18, 22; 2:3
**establish** [4] - 13:6; 17:12; 65:2
**established** [1] - 68:7
**establishes** [1] - 9:8
**estimate** [1] - 4:19
**evaluate** [1] - 40:16
**evaluating** [1] - 74:12
**event** [3] - 17:22; 34:12; 38:1
**events** [1] - 30:10
**evidence** [20] - 7:9, 23; 8:13, 15; 22:2, 25; 23:4; 32:21; 33:10; 34:7; 36:7; 38:11, 24; 44:3; 64:9; 66:17; 72:23; 74:14; 76:10
**exact** [1] - 27:15
**exactly** [3] - 20:18; 39:8; 41:21
**examination** [5] - 20:11, 25; 65:17; 71:23; 72:12
**examine** [2] - 67:5; 68:22
**examining** [1] - 68:2
**example** [3] - 30:1; 36:22; 66:2
**except** [2] - 28:3; 29:3
**exclude** [1] - 46:18
**Exhibit** [1] - 22:16
**exits** [2] - 47:4; 62:9
**experiences** [1] - 29:8

**explain** [3] - 30:18; 40:17, 22
**explore** [1] - 66:9
**exploring** [1] - 34:5
**exposed** [2] - 3:13; 4:5
**exposes** [1] - 44:25
**exposure** [1] - 4:11
**extent** [2] - 32:20; 73:12

## F

**facing** [1] - 72:23
**Facsimile** [1] - 2:21
**fact** [18] - 7:24; 8:22; 18:4; 24:10; 30:12, 14, 20; 41:10; 42:13, 21; 43:18; 44:5, 23; 66:25; 73:7; 74:3, 9; 75:6
**facts** [1] - 20:4
**fair** [1] - 30:8
**fairly** [2] - 47:12; 70:16
**fairness** [1] - 30:15
**faith** [1] - 64:3
**falls** [1] - 32:9
**family** [2] - 42:23; 64:21
**far** [4] - 17:15; 33:10; 38:8; 44:24
**father's** [1] - 28:12
**February** [2] - 28:8, 19
**FEDERAL** [1] - 2:1
**federal** [1] - 66:25
**fellow** [1] - 61:1
**felon** [1] - 44:25
**few** [3] - 6:25; 21:21; 35:17
**file** [1] - 33:7
**final** [2] - 20:24; 42:13
**fine** [7] - 5:8; 26:22; 40:25; 73:21; 76:4, 23, 25
**finish** [1] - 39:11
**first** [14] - 6:12; 7:17; 11:3; 16:4; 21:21; 25:2; 27:13; 31:19; 32:19; 34:25; 37:13; 41:23; 50:13; 63:25
**firsthand** [1] - 27:17
**five** [1] - 50:13
**Floor** [1] - 2:2
**Florida** [1] - 47:9
**focus** [3] - 65:19; 67:9; 68:21
**focused** [5] - 25:17; 32:16; 33:9; 69:11
**focusing** [1] - 32:7
**follow** [1] - 4:12
**followed** [1] - 4:21
**following** [14] - 3:2; 8:21; 39:18; 47:20; 48:2; 51:13; 53:17; 55:11; 58:7; 60:8; 61:8; 62:11; 63:1; 69:13
**FOR** [1] - 1:12
**for'** [1] - 68:12
**foreperson** [1] - 54:3
**forth** [1] - 28:4
**foundation** [6] - 12:20; 13:7; 18:7; 19:6; 34:7; 63:8
**four** [8] - 10:15; 22:6, 9, 11, 14-15; 26:13; 64:5
**framed** [1] - 72:25
**framing** [1] - 73:23
**frankly** [3] - 12:19; 21:8; 76:2
**freely** [1] - 72:15
**Friday** [14] - 38:2; 45:19; 47:9; 50:20; 51:7; 53:11; 57:22, 24-25; 60:19; 61:2; 77:8, 10

**Friday's** [1] - 53:9
**friend** [1] - 67:16
**front** [1] - 70:2
**frowned** [1] - 16:14
**full** [2] - 39:6, 8
**furtherance** [2] - 33:12; 64:24
**furthermore** [1] - 13:2

## G

**gentleman** [1] - 7:11
**gentlemen** [2] - 48:5; 62:2
**girlfriend** [3] - 18:21; 19:1, 12
**given** [2] - 26:12; 36:6; 43:25
**glad** [1] - 5:4
**glove** [2] - 12:13; 71:12
**Government** [36] - 1:15; 7:9, 23; 8:6, 15, 23; 11:19; 12:3, 7; 19:25; 20:3, 7, 23; 21:6, 13; 22:6; 24:15; 26:12; 33:4, 16; 36:2, 6; 42:2, 7, 14; 43:22; 44:20; 45:1; 46:3; 65:7; 66:23; 67:15; 71:4; 74:21; 76:3, 8
**Government's** [10] - 21:24; 23:14, 19; 24:9; 26:9; 35:8; 63:7; 74:4, 12; 75:22
**grams** [1] - 20:4
**great** [1] - 11:20
**guess** [12] - 3:12; 5:11; 17:10; 20:14; 24:17, 19; 26:6; 38:1; 40:17; 45:17; 47:9; 76:6
**guilty** [1] - 74:13
**gun** [1] - 42:8
**guy** [3] - 61:4; 68:12

## H

**half** [3] - 10:15; 15:1; 38:24
**Hammonds** [2] - 46:10; 47:12
**Hammonds'** [1] - 46:9
**hand** [2] - 53:11; 54:2
**handle** [2] - 19:11, 20
**happy** [1] - 13:11
**hard** [1] - 24:5
**hear** [8] - 13:5; 20:25; 22:1; 26:4; 40:14; 41:25; 77:8
**heard** [5] - 11:21; 17:15; 37:13; 64:6; 74:21
**hearing** [6] - 41:9; 50:2; 53:2; 55:2; 57:2; 60:2
**hearings** [1] - 67:11
**hearsay** [2] - 68:12; 70:20
**heart** [1] - 71:22
**held** [6] - 50:1; 53:1; 55:1; 57:1; 60:1; 70:5
**help** [1] - 65:1
**helpful** [1] - 64:2
**her's** [1] - 31:9
**hesitate** [3] - 74:2, 4, 11
**hesitation** [2] - 74:7
**hi** [2] - 53:4; 55:3
**hold** [2] - 25:19; 26:1
**holding** [1] - 26:18
**holds** [1] - 69:10
**Holley** [5] - 50:20; 51:7; 57:21; 60:18, 20

**homes** [1] - 29:15
**honest** [1] - 75:24
**Honor** [36] - 3:10; 4:6, 19; 5:17; 6:6, 11; 12:20; 13:9, 11, 21; 14:4; 16:15, 17; 20:21; 21:2, 8, 10; 22:3, 13; 26:2; 35:10, 21; 37:19; 39:2; 42:25; 45:20; 46:3; 63:11; 64:15; 65:23; 71:17; 72:22; 73:8, 25; 74:14; 77:9
**Honor's** [4] - 10:6; 14:8; 42:9; 45:24
**HONORABLE** [1] - 1:12
**hope** [1] - 64:2
**hopefully** [1] - 49:2
**hotel** [3] - 8:17, 22; 34:2
**hour** [1] - 15:2
**hours** [1] - 48:19
**house** [1] - 28:12
**hurt** [1] - 72:17
**Hyatt** [9] - 9:2; 11:5, 21; 12:5; 27:4; 37:12; 64:7
**Hyatt's** [3] - 27:8; 32:12; 44:21
**hypotheticals** [1] - 13:10

**I**

**idea** [1] - 35:13; 37:4; 68:18
**identifying** [2] - 46:12; 68:13
**ill** [3] - 40:18; 48:13
**illegal** [4] - 66:2, 6; 75:6
**immediate** [1] - 63:20
**implicates** [1] - 26:11
**implied** [1] - 30:3
**impossible** [1] - 4:16
**improper** [1] - 45:2
**incarcerated** [2] - 31:1, 4
**inception** [1] - 67:9
**incident** [1] - 32:9
**inclined** [1] - 20:22
**include** [1] - 64:10
**income** [2] - 9:13; 10:12
**inconsistencies** [1] - 68:24
**inconsistency** [1] - 72:8
**independently** [1] - 20:7
**indicated** [1] - 41:11
**indicates** [1] - 11:21
**indicating** [1] - 31:13
**indication** [5] - 11:23; 12:10, 12; 32:15; 35:22
**indicted** [1] - 33:9
**indictment** [4] - 32:4, 10; 36:1; 41:16
**individual** [2] - 10:13; 13:3
**individuals** [1] - 29:13
**infer** [2] - 10:19; 71:10
**inference** [1] - 10:18
**informant** [6] - 66:8, 10; 72:3, 20; 73:16; 75:1
**information** [28] - 8:3; 28:23; 29:3; 31:25; 33:1; 34:15; 37:3; 38:17; 48:9, 21; 65:16; 66:17; 67:3; 68:9; 70:19, 22; 71:6, 16; 72:3, 10-11, 20; 75:7, 10, 16
**informed** [4] - 4:15; 6:12, 15; 34:8
**infractions** [1] - 69:24
**inquiries** [1] - 6:21
**instances** [1] - 9:6
**instant** [1] - 11:10
**intend** [7] - 21:13; 33:11; 34:7; 42:17;

44:12; 63:8; 74:16
**intended** [1] - 42:15
**intending** [4] - 21:23; 24:22; 64:7
**intends** [2] - 19:25; 44:20
**intention** [3] - 17:5, 8; 48:23
**interaction** [2] - 17:13; 29:1
**interactions** [2] - 9:12; 12:6
**interests** [1] - 67:21
**interim** [1] - 7:2
**Intern** [1] - 2:3
**intern** [1] - 3:20
**interposed** [1] - 7:8
**interrupted** [1] - 34:20
**interrupting** [1] - 13:20
**interruption** [1] - 29:10
**interview** [1] - 37:11
**intricate** [1] - 76:17
**introduce** [3] - 7:9, 24; 64:9
**introduction** [1] - 8:13
**inuring** [1] - 70:21
**investigate** [4] - 32:1; 35:7; 37:5
**investigating** [1] - 76:21
**investigative** [1] - 75:13
**involved** [4] - 30:14, 16; 35:3, 19
**involves** [2] - 29:12
**irreconcilable** [1] - 70:12
**is..** [1] - 22:15
**isolation** [1] - 43:1
**issue** [27] - 7:25; 11:3; 16:18, 21; 20:13; 21:21; 24:18, 20; 26:11; 27:8; 29:17; 30:20; 31:19; 32:23; 33:8, 23; 41:9; 42:13; 44:16; 46:4, 8; 63:3; 65:5; 66:16; 76:9, 17
**issues** [18] - 7:4, 7, 23; 12:20; 18:4; 21:7; 30:11; 31:18; 32:13; 41:22; 72:18; 74:3; 77:4

**J**

**jail** [6] - 10:9, 13, 15; 34:6; 44:1
**James** [4] - 16:22; 17:11, 15, 21
**Jessie** [1] - 32:6
**job** [4] - 8:14; 11:14; 43:19
**Jones** [5] - 18:21; 42:4; 45:25; 63:5
**JUDGE** [1] - 1:13
**Judge** [46] - 5:18; 7:10; 8:19, 25; 9:9, 16, 23; 12:18; 14:17; 15:20; 17:5, 18; 18:9, 18, 24; 20:2, 9, 18; 21:15, 20; 22:8, 10, 22; 23:8; 24:3, 17, 24; 25:10; 26:17, 22; 27:7; 31:4, 14; 32:19, 24; 33:17, 25; 34:25; 35:17; 36:11; 37:1, 16; 38:7, 20; 48:6; 60:23
**judge** [12] - 40:2; 44:15; 47:7, 17; 60:4, 22; 63:7, 18, 25; 74:18; 75:24; 77:12
**July** [1] - 57:9
**jump** [1] - 69:11
**jumped** [1] - 69:12
**June** [9] - 1:7; 5:9; 21:5; 36:8, 11, 13-14; 57:8
**JUROR** [25] - 50:3, 12, 16, 22, 24; 51:3, 6, 9, 11; 53:4, 9, 15; 55:3, 7; 57:4, 10, 15, 20, 24; 58:2; 60:3, 7, 10, 13, 16
**Juror** [1] - 59:2
**juror** [3] - 52:4; 60:23; 74:13
**jury** [30] - 3:3; 10:19; 19:13; 28:25; 30:8;

40:5, 8, 10, 23; 41:17, 19-20, 23; 46:5, 24-25; 47:7; 48:3; 50:2; 53:2; 55:2, 4; 57:2; 60:2; 63:2; 71:10; 72:2; 73:9, 19
**JURY** [1] - 1:12
**Jury** [2] - 48:1; 62:9
**jury's** [2] - 29:22; 74:1
**justify** [2] - 70:11; 73:16

**K**

**Kamdang** [28] - 3:19; 17:7, 19, 22; 20:19; 22:12; 23:12; 31:15; 34:1, 4; 35:7; 36:21; 38:9, 17; 40:21; 41:1; 63:19; 65:12, 21; 67:21; 69:1; 71:18, 24; 74:19, 25; 76:7, 11
**KAMDANG** [69] - 2:3; 3:18; 5:9, 17; 11:1, 3; 13:17; 15:7, 16; 16:17, 21; 17:10; 18:2; 20:21; 22:13, 16, 18; 23:13, 21; 24:7, 13; 26:2, 6; 31:18; 33:22; 35:10, 21; 36:14, 18, 22; 37:2, 10, 19, 23; 38:3; 41:2, 4, 8, 15; 45:15, 20; 46:2, 7, 16, 20, 22; 53:13; 60:22; 63:11; 65:23, 25; 71:20; 72:4, 7, 14, 22; 73:5, 8, 14, 21, 25; 74:9; 75:9, 19, 22; 76:15, 23, 25
**keep** [1] - 24:6
**kept** [1] - 48:8
**kinds** [2] - 70:15; 75:21
**Kings** [1] - 31:11
**Kingsport** [2] - 68:19
**knowing** [1] - 50:25
**knowingly** [1] - 20:16
**knowledge** [6] - 9:12; 11:12; 20:13, 20; 27:17; 36:5
**knows** [2] - 29:2; 61:1

**L**

**ladies** [2] - 48:4; 62:2
**Lafayette** [1] - 1:21
**last** [10] - 11:5; 31:25; 33:23; 36:18; 37:12; 50:4, 17; 53:5, 10
**lasted** [1] - 36:3
**late** [1] - 38:1
**law** [1] - 50:3
**lawyers** [5] - 25:8; 26:20; 40:22
**lay** [1] - 18:7
**laying** [2] - 42:5, 12
**learned** [6] - 11:5; 31:25; 33:2; 34:6; 35:23; 47:8
**least** [5] - 5:3; 8:20; 21:21; 37:18; 64:2
**leave** [1] - 19:3
**leaving** [1] - 66:13
**left** [1] - 14:6
**legal** [1] - 7:4
**legitimacy** [1] - 73:19
**legitimate** [1] - 8:14
**Len** [1] - 3:19
**length** [1] - 4:18
**lengthens** [1] - 68:1
**lengthy** [2] - 49:1
**less** [1] - 28:20
**letter** [8] - 21:5, 9; 32:25; 33:1; 36:7, 9, 11, 14
**lie** [2] - 74:17; 75:2

life [1] - 45:1
light [1] - 71:14
limited [2] - 71:4, 14
line [6] - 39:14; 61:1; 68:7, 14; 70:17
line-for-line [1] - 70:17
lines [2] - 25:3; 26:3
Linsey [1] - 11:5
list [1] - 7:22
listen [1] - 20:24
litigate [1] - 12:20
litigating [2] - 32:11, 13
living [1] - 28:2
local [1] - 46:12
locations [2] - 27:25; 28:17
locus [1] - 32:17
look [2] - 44:5; 70:2
looking [11] - 26:21; 43:4; 65:17; 67:1; 68:12, 15; 69:4; 70:24; 72:16, 21; 73:7
looks [3] - 21:19; 36:11
loosely [1] - 68:23
lose [1] - 24:5
losing [2] - 23:8, 10
low [2] - 42:5, 12
lying [4] - 72:2, 5; 74:24; 75:6

## M

ma'am [3] - 49:7; 56:2; 57:3
mail [1] - 2:21
man [3] - 17:13; 69:14, 16
mandatory [1] - 45:1
maneuvers [2] - 66:3, 20
Manhattan [1] - 4:10
Mann [1] - 60:23
Marshal [2] - 6:19; 14:5
Marshals [2] - 4:7; 13:21
MARY [1] - 2:12
MARY-ANNA [1] - 2:12
mask [2] - 16:7, 12
material [6] - 22:15; 36:16, 18; 37:10; 38:9, 15
matter [6] - 9:3; 18:23; 26:10; 49:1, 3; 70:13
matters [1] - 57:14
MATTHEW [1] - 1:18
Matthew [1] - 3:8
MCC [6] - 4:9, 12, 14; 5:16, 19; 6:12
MCC's [1] - 4:21
McNALLY [2] - 2:10; 15:19
MDC [6] - 5:16; 9:5, 25; 14:6; 19:4; 31:5
meals [1] - 28:14
mean [18] - 18:10; 23:9; 26:3; 29:5; 30:15; 32:20; 35:8; 38:3; 45:15; 50:16; 53:9; 65:6, 13; 69:7; 72:14; 73:24; 74:16; 76:4
meaningless [2] - 23:17, 22
means [1] - 26:1
meant [1] - 13:24
medical [5] - 4:21; 6:13; 14:21; 16:3; 48:21
meet [1] - 60:20
meeting [3] - 6:16; 40:23
meets [1] - 70:10
mention [3] - 18:10; 21:1, 25

mere [2] - 74:7
merely [1] - 70:13
mess [1] - 70:8
message [1] - 4:8
met [5] - 27:9-11, 23; 34:17
methods [1] - 12:5
Metropolitan [1] - 4:9
middle [2] - 29:1; 66:5
might [7] - 6:15; 8:1, 5; 22:16; 45:21; 70:14, 17
mind [2] - 25:6, 14
minutes [4] - 7:1; 63:19; 66:21; 68:5
misconduct [3] - 29:18
Miss [12] - 42:4; 44:21; 50:20; 51:7; 57:21; 60:18, 20; 63:5; 64:7; 70:1
mission [1] - 46:11
mistake [3] - 67:9; 69:19, 21
mistakes [1] - 68:23
moment [2] - 21:11; 69:19
Mommy [1] - 50:7
Monday [24] - 5:24; 38:25; 39:3, 12; 40:5-7, 13; 41:7; 42:1; 45:9; 48:22, 24; 49:5; 50:10, 17; 51:3, 5; 55:4, 8; 57:12; 62:5; 77:5
money [25] - 9:8; 10:19; 18:16; 19:2, 5, 12; 23:10; 24:5; 42:14, 16, 18, 21, 23; 43:11, 16, 18-19, 24; 44:1; 64:18; 65:1; 67:18
month [1] - 50:14
months [1] - 31:3
morning [9] - 3:10; 4:4, 8; 48:4, 12, 17; 49:5; 50:7
mother [3] - 10:3; 15:17
motion [2] - 32:25; 33:7
motivated [1] - 74:11
motive [2] - 43:11
move [2] - 65:15; 76:16
moves [1] - 66:2
moving [3] - 24:15; 45:21; 46:18
must [2] - 42:19; 43:24
mystery [1] - 11:6

## N

name [4] - 18:5, 10; 43:6; 57:4
names [1] - 35:23
narcotics [1] - 9:8
nature [1] - 70:12
near [1] - 70:1
necessarily [1] - 74:5
necessary [2] - 30:17; 68:3
need [14] - 6:5; 32:1; 35:9; 36:20; 39:6; 41:6; 45:3; 57:12, 15; 61:2; 65:3; 76:12; 77:4
needed [1] - 52:2
needs [2] - 19:13; 71:14
never [6] - 11:21; 35:21; 69:9; 70:4
new [3] - 35:12, 14
NEW [2] - 1:1; 2:1
New [18] - 1:6, 16-17, 22; 2:2; 6:20; 10:3; 12:10; 13:4; 23:1; 24:4; 28:4; 42:18; 64:20, 23; 67:3; 75:23
next [20] - 4:25; 5:1, 4, 8, 10; 37:20; 48:24; 49:10; 52:6; 53:5, 10; 54:5; 56:4; 57:12, 15; 59:5; 60:15

nexus [2] - 12:2, 4
night [7] - 11:5; 31:25; 33:23; 36:18; 37:12; 50:4
nine [1] - 25:2
NO [25] - 50:3, 12, 16, 22, 24; 51:3, 6, 9, 11; 53:4, 9, 15; 55:3, 7; 57:4, 10, 15, 20, 24; 58:2; 60:3, 7, 10, 13, 16
nobody's [1] - 74:20
nonsense [1] - 23:16
nothing [2] - 42:7; 70:3
notice [11] - 31:23; 32:23; 33:5, 20; 38:15, 17; 44:19, 22
notify [1] - 77:7
November [3] - 28:19; 32:6; 36:1
number [13] - 4:22; 5:19; 6:18, 23; 7:7, 17; 14:7, 9-10; 43:19; 57:21; 60:18
Number [1] - 52:4

## O

object [1] - 65:7
objected [1] - 21:4
objecting [1] - 22:12
objectionable [1] - 24:25
objections [4] - 7:8; 21:19; 46:8; 64:14
obligated [1] - 69:7
obtained [1] - 48:22
obvious [1] - 37:11
obviously [10] - 10:5; 24:21; 26:4; 29:5; 30:6; 35:18; 39:2; 43:1; 71:8; 74:20
occurred [2] - 48:2; 63:1
occurs [1] - 3:2
OF [4] - 1:1, 3, 12; 2:1
offer [2] - 8:15; 24:23
offered [3] - 6:20; 15:22; 28:1
offering [4] - 19:25; 23:3, 5; 24:17
office [1] - 4:8
Officer [2] - 16:21; 17:21
officer [4] - 4:14; 17:4
officers [7] - 66:1, 4; 68:8; 71:5; 74:10; 75:10; 76:15
officers' [2] - 66:14; 75:13
Official [1] - 2:20
officials [1] - 6:22
often [3] - 28:20; 29:16; 69:12
once [7] - 22:24; 28:21; 29:12; 64:7; 68:7, 14; 70:7
one [3] - 3:16; 5:13, 18; 7:23; 8:20; 9:1; 11:20; 18:19; 24:20; 26:24; 27:24; 28:15; 32:8; 33:13; 37:10; 38:4, 23; 41:9; 42:2; 43:5; 44:16; 47:8; 48:13, 16; 65:5; 67:17; 69:2, 6; 70:23; 74:16
one's [1] - 40:15
open [9] - 3:1; 40:1; 45:8; 52:1; 54:1; 56:1; 59:1; 62:1; 70:7
opening [3] - 20:25; 21:1, 25
operating [1] - 27:16
opining [2] - 23:17, 22
opinion [2] - 69:13
opposed [4] - 13:10; 28:21; 75:4; 76:13
order [1] - 67:18
otherwise [4] - 30:12; 48:17; 57:7; 68:3
ought [1] - 46:10
outbreak [1] - 4:11
outside [5] - 3:2; 15:22; 63:1; 65:18;

68:19

**outstanding** [4] - 7:8, 22, 25; 8:7
**own** [4] - 11:10; 21:20; 29:20; 65:12
**OxyContin** [12] - 8:9; 67:1; 70:25; 71:2; 72:10; 74:22; 75:2, 4, 18, 23; 76:13

## P

**P.C** [1] - 1:20
**pack** [1] - 53:6
**package** [1] - 47:14
**page** [19] - 22:6, 9, 11, 14-15; 39:18; 47:20; 49:10; 51:13; 52:8; 53:17; 54:5; 55:11; 56:4; 58:7; 59:5; 61:8; 62:11
**paid** [1] - 12:11
**pants** [1] - 70:2
**pardon** [1] - 41:3
**part** [12] - 12:19; 22:5; 26:20; 33:15; 34:12; 35:15; 42:20; 43:5, 12, 25; 46:9; 57:16
**participated** [1] - 30:5
**particular** [3] - 8:3; 12:16; 61:4
**particularly** [3] - 42:22; 44:9; 70:24
**parties** [6] - 15:3; 30:19; 38:21; 48:13, 25; 77:7
**parties'** [1] - 4:25
**parts** [1] - 45:21
**party** [1] - 48:22
**past** [1] - 18:22
**pattern** [2] - 28:22; 68:18
**Pause** [11] - 3:21; 6:9; 10:23; 13:18; 14:2, 18; 19:21; 22:20; 47:5, 18; 63:15
**pay** [3] - 47:10, 15
**paying** [2] - 25:5, 14
**penalty** [3] - 47:10, 15
**people** [20] - 6:16; 14:21; 16:3; 27:14; 29:6, 14; 34:2, 6, 9; 35:2, 12-14, 19; 42:16, 22; 60:20; 68:18; 69:11
**people's** [1] - 29:15
**percent** [2] - 31:20
**perfect** [2] - 70:14; 72:24
**perfectly** [1] - 76:25
**perform** [1] - 57:20
**perhaps** [2] - 6:21; 49:1
**period** [15] - 10:16; 11:17; 27:14, 17, 21; 29:21, 24; 31:10; 32:9; 34:11, 14; 36:4; 64:17, 22
**peripheral** [1] - 35:18
**permission** [1] - 63:19
**permit** [2] - 8:12; 20:22
**person** [7] - 9:14; 48:15, 20; 65:18; 67:6; 69:4; 72:15
**personal** [1] - 9:11
**personally** [3] - 12:9; 40:19; 76:7
**personnel** [1] - 6:11
**perspective** [2] - 65:11; 71:23
**pertain** [2] - 21:20; 70:23
**pertained** [1] - 68:9
**pertains** [1] - 32:21
**phone** [6] - 5:19; 9:4; 14:7; 25:14; 64:11
**pick** [1] - 28:16
**picked** [1] - 60:23
**picture** [1] - 48:14
**piece** [3] - 8:3; 26:7; 37:10
**pieces** [1] - 7:23

**pigeonholed** [1] - 64:3
**place** [3] - 17:20; 19:14; 29:21
**places** [2] - 26:13, 16; 29:14
**plainly** [1] - 71:1
**plan** [2] - 31:13; 49:4
**plans** [2] - 47:8; 51:4
**play** [1] - 22:2
**Plaza** [1] - 1:17
**pled** [1] - 42:9
**pocket** [1] - 20:5
**point** [17] - 8:2, 5, 10; 13:16; 22:4; 23:13; 27:25; 28:10; 40:5; 66:13; 72:4, 7, 22; 74:25; 75:5; 76:6
**points** [1] - 28:11
**police** [7] - 65:17, 25; 66:3, 14, 25; 67:5; 69:23
**poor** [3] - 42:16, 19; 43:2
**Port** [1] - 31:11
**portion** [1] - 24:25
**portions** [1] - 21:15
**position** [6] - 10:7; 33:4; 65:10; 66:10; 68:22; 72:7
**positive** [2] - 42:4; 77:8
**possessed** [1] - 10:22
**possession** [2] - 8:9; 20:15
**possessions'** [1] - 43:7
**possibility** [1] - 5:15
**possibly** [2] - 8:1; 57:13
**pound** [1] - 50:13
**pox** [13] - 3:13; 4:5, 12; 14:24; 15:4, 7, 11, 13; 45:11, 16, 18; 61:2; 77:8
**pre** [1] - 34:15
**pre-dated** [1] - 34:15
**preclude** [1] - 8:5
**predating** [1] - 36:7
**prefer** [2] - 39:11; 70:15
**preference** [2] - 5:10; 39:1
**prejudice** [8] - 8:4; 65:16; 68:4, 10, 16-17; 70:18, 25
**prejudiced** [2] - 67:23; 68:1
**prejudicial** [2] - 23:16; 44:9
**prepare** [1] - 37:20
**presence** [4] - 3:2; 40:9; 48:2; 63:1
**present** [2] - 34:17; 40:11
**presiding** [1] - 48:6
**prevailed** [1] - 33:23
**principally** [1] - 20:13
**Principe** [1] - 15:20
**PRINCIPE** [1] - 2:12
**prison** [1] - 10:12
**probation** [1] - 17:3
**Probation** [1] - 16:21
**problem** [18] - 11:4, 18; 12:19; 26:6; 35:25; 40:15; 41:2, 4, 7, 18; 43:1; 53:12; 55:3; 57:11; 65:11; 68:14; 71:2
**problematic** [3] - 16:13; 26:4, 8
**problems** [1] - 4:24
**proceed** [2] - 48:11, 20
**proceedings** [11] - 3:21; 6:9; 10:23; 13:18; 14:2, 18; 19:21; 22:20; 47:5, 18; 63:15
**Proceedings** [2] - 2:22; 77:16
**proceeds** [1] - 9:10
**produced** [4] - 2:23; 4:5, 17; 14:24
**profiling** [2] - 73:17

**proof** [3] - 9:11; 12:3; 42:20
**proper** [1] - 13:6
**propose** [3] - 21:23; 22:1; 30:22
**prove** [6] - 8:24; 16:23; 17:2, 10, 16; 19:25; 20:7, 23; 23:5; 42:17, 22; 43:15; 44:5, 10-11; 76:12
**proves** [2] - 42:15; 43:22
**provide** [3] - 32:24; 33:5; 38:17
**provided** [2] - 33:1; 37:2
**proving** [2] - 17:3; 44:9
**Pughe** [37] - 3:5, 12; 4:4, 9; 9:12; 11:21, 23; 14:22; 18:19; 19:2, 5; 21:19; 32:6, 18; 39:4; 41:22; 42:3, 14; 46:14; 65:19; 67:17; 68:9, 11, 13-14, 21, 24; 69:3, 8, 16, 23, 25; 70:5, 23; 71:11
**PUGHE** [1] - 1:8
**Pughe's** [2] - 3:25; 18:21
**pull** [1] - 14:21
**pulled** [1] - 6:17
**purposes** [1] - 3:25
**pursuant** [1] - 19:12
**put** [12] - 12:13; 21:13, 24; 22:7; 24:10, 16; 33:6; 37:15; 38:24; 41:15; 42:3; 44:19, 21; 61:3; 64:4; 74:16, 20; 75:17; 76:10
**putting** [2] - 33:14; 44:23

## Q

**quadrupling** [1] - 36:4
**quarantine** [5] - 4:10, 16, 18; 5:24; 40:20
**quarantined** [1] - 15:1
**questioning** [2] - 74:19
**quibble** [1] - 43:3
**quite** [1] - 27:9
**quote** [1] - 11:5

## R

**racial** [5] - 73:16, 18; 74:11, 23; 75:9
**raid** [1] - 34:2
**raise** [1] - 44:16
**raised** [1] - 54:2
**rather** [1] - 5:11
**razor** [5] - 46:4, 14-15, 18; 66:23
**reach** [1] - 4:22
**reached** [3] - 19:10; 71:19
**read** [3] - 23:15; 24:7; 39:7
**real** [1] - 38:13
**really** [19] - 11:15; 15:24; 25:3, 25; 27:8; 29:9, 16; 38:21; 44:2, 11; 47:15; 49:3; 50:18; 64:14; 67:2, 14; 68:25; 69:7, 15
**rearrange** [1] - 57:14
**reason** [12] - 12:4; 22:7; 38:10; 66:7, 16; 67:8; 68:20; 69:8, 10; 74:2, 13
**reasonable** [4] - 10:18; 48:14; 73:25; 74:5
**reasonably** [1] - 48:20
**reasons** [7] - 16:6; 65:8, 13; 67:11, 23; 73:23; 76:2
**receive** [1] - 13:3
**received** [8] - 4:7, 13, 19; 13:21; 14:4; 32:25; 35:25; 75:7

**Recess** [1] - 39:16
**recess** [1] - 45:6
**recognize** [1] - 65:14
**reconsider** [1] - 24:21
**record** [10] - 3:7; 17:20; 41:15; 45:3;
50:1; 53:1; 55:1; 57:1; 60:1, 22
**recorded** [3] - 2:22; 9:4; 64:12
**records** [1] - 64:11
**recourse** [1] - 74:17
**redact** [1] - 41:17
**reevaluate** [1] - 26:19
**reference** [2] - 10:21; 36:9
**references** [2] - 12:17; 29:6
**referred** [1] - 11:6
**referring** [3] - 24:18; 25:1; 35:3
**refers** [6] - 9:5; 10:1; 22:25; 23:8; 25:25
**reformed** [1] - 29:12
**registered** [1] - 18:5
**regular** [1] - 70:4
**regularly** [1] - 28:10
**relate** [1] - 8:9
**related** [4] - 32:16; 42:6, 9; 44:3
**relates** [3] - 24:3; 74:23
**relationship** [4] - 11:8; 28:9; 29:6;
30:18; 31:9, 17
**release** [7] - 28:7; 30:2, 25; 31:2; 34:21;
35:2; 40:4
**released** [2] - 10:9, 12
**relevance** [3] - 8:2; 22:4; 63:6
**relevant** [13] - 8:1, 5, 11-12; 13:9;
18:23; 20:13, 17; 30:12; 31:16; 65:1, 24
**reliability** [1] - 75:13
**reliable** [2] - 66:8; 73:16
**remains** [1] - 32:22
**remanded** [1] - 77:14
**removing** [1] - 30:6
**report** [2] - 53:6, 11
**Reporter** [2] - 2:19
**reschedule** [1] - 5:22
**residence** [1] - 28:3
**resolution** [1] - 71:19
**resolve** [3] - 39:12; 41:23; 65:10
**respect** [2] - 8:8; 24:25
**response** [1] - 15:12
**rest** [1] - 23:4
**resume** [1] - 48:23
**return** [1] - 49:5
**returned** [3] - 27:11, 14; 31:11
**returning** [1] - 76:11
**returns** [1] - 28:7
**review** [1] - 37:7
**revisit** [2] - 11:1; 16:17
**revisiting** [1] - 16:19
**revisits** [1] - 44:17
**Rick** [3] - 16:21; 17:11, 14
**righty** [1] - 24:14
**rise** [1] - 3:4
**risk** [2] - 15:23
**rob** [1] - 43:20
**Rohrkemper** [1] - 3:20
**ROHRKEMPER** [1] - 2:3
**room** [3] - 8:18, 22; 34:2
**ROTHMAN** [1] - 1:20
**routine** [1] - 70:16
**row** [1] - 39:3

**Rule** [2] - 20:10
**rule** [2] - 13:9, 14
**ruled** [2] - 46:3; 70:25
**ruling** [8] - 8:8; 13:12; 19:19; 20:24;
42:9; 45:22, 24; 71:14
**run** [2] - 42:5, 12
**running** [2] - 42:7

## S

**safety** [2] - 16:6; 38:14
**satisfies** [1] - 71:13
**scale** [1] - 70:2
**schedule** [1] - 5:7
**scheduling** [3] - 4:1; 38:22; 40:24
**SCHNEIDER** [1] - 1:20
**school** [2] - 53:4
**score** [1] - 41:16
**search** [1] - 73:20
**searched** [2] - 43:16; 44:6
**seat** [3] - 58:4; 70:2
**seated** [1] - 48:5
**second** [7] - 9:4; 11:18; 28:17, 19; 33:8;
39:9; 46:4
**secure** [1] - 33:3
**see** [22] - 5:21; 7:1; 8:2; 12:25; 13:2;
17:24; 21:10; 22:14; 28:20; 42:11; 44:8;
45:13; 47:10; 50:16; 51:10; 67:25; 68:6,
9; 69:23; 76:18
**seeking** [3] - 24:16; 46:3; 76:1
**seeks** [2] - 7:9, 24
**seem** [6] - 7:7; 16:19; 26:10; 30:8;
70:16; 75:3
**sees** [3] - 28:12, 20; 29:4
**seized** [1] - 34:3
**sell** [5] - 29:16; 42:15, 17, 20; 43:20
**selling** [4] - 27:25; 28:17; 43:2; 64:18
**send** [1] - 64:20
**senior** [2] - 57:5, 17
**sense** [5] - 13:13; 17:25; 26:7; 43:23;
72:15
**sent** [2] - 19:5; 63:10
**sentence** [1] - 45:1
**separate** [1] - 28:5
**September** [1] - 36:1
**seriously** [3] - 44:20; 45:2; 73:15
**served** [1] - 31:4
**serves** [1] - 44:25
**Service** [2] - 4:7; 13:21
**sets** [1] - 68:17
**seven** [1] - 60:17
**several** [3] - 8:21; 9:6; 62:4
**severance** [2] - 65:15; 70:11
**Sheehan** [3] - 6:20; 7:12; 14:5
**short** [1] - 38:24
**show** [7] - 57:5, 16; 67:5; 69:8
**showing** [1] - 64:25
**Side** [5] - 50:1; 53:1; 55:1; 57:1; 60:1
**Side-bar** [5] - 50:1; 53:1; 55:1; 57:1;
60:1
**sidebar** [1] - 59:2
**Sidebar** [10] - 49:9; 51:12; 52:5; 53:16;
54:4; 55:10; 56:3; 58:6; 59:4; 61:7
**significance** [1] - 22:23

**significantly** [1] - 12:6
**similar** [5] - 27:5, 16; 28:23; 34:18; 35:8
**simple** [3] - 67:19
**simply** [1] - 74:16
**single** [1] - 66:22
**sit** [3] - 25:23; 38:2; 71:20
**situation** [3] - 11:13; 31:21; 75:10
**small** [1] - 41:9
**solely** [1] - 69:13
**SOLOWAY** [1] - 1:20
**solves** [1] - 41:7
**someone** [12] - 6:17; 18:5; 43:6; 52:2;
54:2; 57:19; 65:18; 67:1; 71:6, 16; 72:10;
76:12
**sometime** [1] - 11:7
**sometimes** [1] - 42:16
**son** [1] - 50:6
**soon** [1] - 33:2
**sorry** [9] - 29:19; 45:20; 48:8; 62:6;
63:11, 13
**sort** [3] - 17:20; 26:12; 71:18
**sounded** [1] - 69:19
**source** [1] - 9:13
**south** [1] - 42:24
**spanning** [1] - 28:19
**speaking** [1] - 13:22
**specific** [2] - 38:10; 74:22
**specified** [1] - 32:9
**speeding** [1] - 66:5
**spend** [2] - 50:10, 12
**spends** [1] - 10:14
**split** [1] - 63:21
**spoken** [1] - 65:9
**squeeze** [1] - 5:8
**stand** [1] - 38:5
**standard** [2] - 70:11; 74:1
**start** [2] - 38:4; 39:4
**started** [4] - 5:24; 35:4; 69:13
**starting** [2] - 5:9; 60:5
**starts** [3] - 28:8, 25; 41:7
**state** [2] - 3:6; 67:2
**statement** [1] - 21:1
**statements** [1] - 20:25
**STATES** [3] - 1:1, 3, 13
**States** [6] - 1:5, 16, 18; 3:5, 9; 6:19
**stating** [1] - 4:8
**station** [6] - 65:8; 68:20; 69:14, 23;
71:5, 15
**stay** [4] - 14:25; 25:17
**stays** [1] - 28:11
**steady** [1] - 28:3
**stenography** [1] - 2:22
**step** [1] - 15:22
**stern** [4] - 43:13; 46:20; 69:18; 73:12
**STERN** [42] - 1:20, 22; 3:12; 4:2; 5:1,
23; 6:3; 7:5; 15:6; 16:8, 10, 14; 19:9, 16,
18; 38:20; 40:8, 12, 17, 25; 41:22; 42:2,
13; 43:18; 44:11; 45:12, 17; 46:8, 13;
61:4; 63:18, 24; 65:5, 21; 66:16; 67:8;
68:17; 69:5, 21; 71:3; 77:1, 6
**Stern** [4] - 3:12, 24; 7:3; 15:5
**still** [6] - 3:16; 5:6; 21:7; 32:22; 34:7;
74:21
**stimulus** [1] - 47:14
**stint** [2] - 28:17, 19

stipulate [2] - 18:25; 20:20
stop [6] - 32:5, 17; 66:3; 69:24; 73:20
stopped [1] - 66:21
stopping [1] - 66:5
store [1] - 70:4
story [2] - 66:15; 73:10
strategy [2] - 70:13, 17
Street [2] - 1:21; 2:1
street [1] - 66:5
strength [4] - 23:6, 12, 20, 24
strictly [1] - 7:4
strong [1] - 44:8
strongly [1] - 30:3
stuff [2] - 32:12; 68:2
subject [2] - 18:23; 26:10
submission [2] - 23:14; 30:16
substances [1] - 75:7
success [1] - 46:11
suggest [2] - 16:6; 65:13
suggested [2] - 16:11; 48:22
Suite [1] - 1:21
sum [1] - 38:25
summons [1] - 55:4
Sunday [5] - 50:11; 60:5, 8, 24
supervised [4] - 30:2, 25; 31:2, 5;
34:20; 35:1
supported [1] - 28:1
suppose [4] - 8:14; 30:17; 72:14; 76:20
supposed [2] - 50:4, 6
supposedly [1] - 74:22
supposition [1] - 68:11
suppression [1] - 41:9
Supreme [1] - 55:4
surveilling [3] - 65:8; 71:5, 15
SUV [1] - 18:5
SUV's [1] - 18:10

## T

table [2] - 15:18; 66:14
tactical [4] - 65:13; 67:22, 24
tactically [1] - 69:7
tail [1] - 31:22
talks [2] - 12:5; 25:7
tamper [2] - 44:21; 45:2
tampering [3] - 38:11, 14; 44:23
tape [2] - 37:7, 9
taped [1] - 37:11
tapes [1] - 22:3
Taylor [27] - 3:5, 18-19, 23; 9:5; 11:7,
11, 22; 12:9; 15:11; 21:4; 32:18; 34:5;
38:12; 43:25; 44:19, 22; 46:23; 47:4;
63:17; 65:7; 70:4; 72:23; 74:6, 15, 17;
77:14
TAYLOR [1] - 1:8
Taylor's [9] - 5:16; 8:14; 19:24; 20:14;
21:16, 19; 34:3; 41:10; 67:17
teacher [1] - 53:4
techniques [1] - 75:14
Telephone [1] - 2:20
telephone [4] - 6:23; 9:25; 14:10; 19:4
ten [3] - 21:15; 35:12; 68:5
Tennessee [15] - 18:17; 23:1; 24:4;
27:12, 15; 42:6, 18; 43:20; 64:22; 66:18,

20; 68:19
terms [7] - 8:14; 11:18; 12:5; 19:24;
24:18; 34:14; 72:12
Terrell [3] - 14:6, 16
test [1] - 77:8
testified [4] - 12:21; 20:2, 4; 75:15
testifies [2] - 37:18; 38:16
testify [15] - 10:7; 11:12; 12:12, 22;
13:11; 25:11, 25; 30:7; 32:12; 37:25;
38:1; 46:11; 64:5, 19; 76:15
testifying [7] - 25:15; 29:1, 3; 36:23-25;
37:14
testimony [18] - 8:24; 9:1, 7; 13:6; 20:1;
27:8; 31:19; 32:8; 33:3, 20; 34:16; 38:4;
42:12; 44:21; 46:9; 47:12; 64:8; 73:5
testimony's [1] - 33:20
tests [1] - 45:13
THE [211] - 1:12; 3:4, 11, 15-16, 24; 4:3,
18, 24; 5:14, 21; 6:1, 5, 7, 25; 7:6, 10,
12-13, 15-16, 18-19, 21; 8:23; 9:7, 10,
14, 17, 20; 10:25; 11:2; 12:15; 13:13, 16,
24; 14:1, 9, 12, 14, 16, 20; 15:8, 10,
12-15, 17, 24; 16:2, 9, 11, 16, 19, 23;
17:2, 6, 14, 24; 18:4, 11, 14, 19, 22;
19:7, 15, 17, 23; 20:6, 12, 19, 22; 21:3,
12, 16; 22:5, 11, 17; 23:5, 11, 18, 23;
24:9, 14, 22; 25:9, 12; 26:15, 19, 23;
27:2, 19; 30:11, 23; 31:1, 6, 12, 15;
32:20; 33:13, 18; 34:14, 23; 35:5, 14;
36:6, 13, 16, 20, 24; 37:9, 14, 17, 21, 25;
38:6; 39:14; 40:3, 10, 14; 41:3, 5, 14,
18-21, 25; 42:11; 43:8, 15; 44:5, 14;
45:5, 9, 13, 18; 46:1, 5, 10, 14, 18, 21,
23; 47:1, 14; 48:4; 50:9, 15, 19, 23, 25;
51:4, 7, 10; 52:2; 53:3, 7, 12; 54:2; 55:5,
8; 56:2; 57:3, 9, 11, 18, 21, 25; 60:6, 9,
11, 15, 18; 61:1; 62:2; 63:3, 14, 23; 65:3,
20, 22, 24; 67:7, 25; 69:2, 18; 70:10;
71:22; 72:5, 9, 17; 73:4, 6, 9, 18, 22;
74:8; 75:17, 20, 25; 76:11, 20, 24; 77:2,
4, 7, 11, 13
theory [10] - 23:14, 19; 25:9; 26:9;
32:21; 63:7; 64:16; 72:24; 75:22
therefore [2] - 42:19; 72:5
they've [1] - 18:25
thinks [1] - 23:15
THOMAS [1] - 2:10
thousand [1] - 10:3
threat [1] - 44:22
three [7] - 5:3; 10:15; 21:18; 26:13;
44:25; 49:2; 57:7
three-and-a-half [1] - 10:15
three-time [1] - 44:25
throughout [1] - 10:17
Thursday [3] - 5:12; 57:6, 13
ticket [1] - 43:6
tickets [1] - 60:11
timed [1] - 35:18
timing [1] - 12:18
tip [3] - 66:10; 75:14; 76:12
today [8] - 4:23; 14:25; 38:24; 39:4, 11;
40:4; 50:8; 55:7
together [4] - 25:23; 28:3; 33:6
tomorrow [4] - 37:24; 38:5, 24; 39:11
took [2] - 29:21; 33:5
Torres [1] - 2:19

total [1] - 10:14
touch [2] - 60:19; 68:25
touching [1] - 70:5
towards [1] - 74:25
traffic [3] - 66:3, 20; 69:24
transaction [1] - 12:16
transcript [1] - 39:7
TRANSCRIPT [1] - 1:12
Transcript [1] - 2:22
Transcription [1] - 2:23
transferred [4] - 6:12, 18; 39:15; 71:12
transfers [13] - 18:15-17; 45:25; 46:2,
12; 63:4, 6, 9; 64:11, 16, 20
transporting [1] - 13:4
travelling [1] - 60:4
trial [24] - 5:7, 9-10, 13, 22; 8:1, 4;
12:17; 20:1; 31:22; 37:20, 23; 38:4; 39:7;
48:7; 49:3; 60:24; 63:9; 65:6; 68:1; 69:1,
8, 22; 70:14
TRIAL [1] - 1:12
tried [5] - 5:20; 7:22; 69:6, 22; 70:15
tries [1] - 47:11
trip [2] - 57:8, 12
trips [1] - 28:4
true [8] - 8:8; 10:8; 11:25; 22:8; 37:3;
41:13; 69:16
trunk [2] - 10:1, 16
truthful [1] - 66:11
try [5] - 5:1, 21; 70:6, 9; 76:4
trying [7] - 12:20; 47:10; 48:9, 14, 18;
72:19; 73:12
Tuesday [4] - 39:3, 12; 57:5, 12
turn [3] - 37:4; 38:15; 66:6
turned [3] - 35:24; 37:8, 11
turns [3] - 37:3; 67:1, 12
twelve [1] - 21:15
two [16] - 4:25; 5:6; 8:25; 18:20; 23:18;
30:11, 23; 31:1; 35:23; 39:3, 5-6, 8;
45:22; 50:12, 17
two-day [1] - 5:6

## U

U-turn [1] - 66:6
ultimately [2] - 70:18; 71:7
unable [1] - 4:22
unavoidable [1] - 62:7
under [7] - 4:10; 9:21; 20:9, 11-12;
27:10; 43:4
undermining [1] - 72:12
understandings [1] - 29:7
unemployment [1] - 16:24
unequivocally [1] - 17:20
unforeseen [2] - 17:22; 48:16
unit [4] - 4:10, 21; 6:13; 46:11
UNITED [3] - 1:1, 3, 13
United [6] - 1:5, 16, 18; 3:5, 8; 6:19
unless [1] - 8:11
unnatural [1] - 28:25
unquote [1] - 11:5
up [30] - 4:12, 21; 7:3; 8:11; 12:9; 18:13;
22:24; 23:3; 24:4; 28:8, 16; 29:16; 30:3,
5; 33:14; 35:4; 38:25; 39:2; 41:6, 12;
53:6; 65:4; 66:24; 68:17; 71:21; 73:10,
15; 76:19; 77:4

user [1] - 28:12
usual [1] - 34:24

**V**

vacation [1] - 47:8
vague [1] - 9:24
valid [1] - 74:12
various [1] - 66:19
VButlerRPR@aol.com [1] - 2:21
venue [1] - 65:2
veracity [1] - 66:9
versus [1] - 72:11
Victoria [1] - 2:19
view [1] - 70:23
vigorous [1] - 74:15
violation [4] - 30:2, 25; 31:2; 34:21
vis [2] - 72:20
vis-a-vis [1] - 72:20
visit [1] - 21:21
visiting [2] - 10:2
volunteer [1] - 57:5
vote [1] - 74:13

**W**

wag [1] - 31:22
wait [3] - 6:25; 7:19; 13:5
waiting [5] - 3:16, 18; 44:15; 48:8
waive [1] - 3:24
wants [2] - 8:15; 65:20
warden [7] - 14:6, 20-21; 16:3; 40:3; 45:5, 9
Warden [1] - 14:7
warden's [1] - 39:14
warrant [2] - 42:6, 10
warrants [2] - 7:25; 8:7
watching [1] - 68:20
Watts [2] - 41:11
ways [4] - 8:25; 28:6; 43:19; 67:6
weakest [1] - 66:24
wear [2] - 16:7, 12
Wednesday [5] - 1:7; 5:12; 50:10; 57:6, 13
week [24] - 4:20; 5:1, 4, 8, 10-11; 6:3; 28:21; 36:15; 37:20; 38:1; 51:1; 53:5, 7-8, 10; 57:12; 60:14-16; 61:3
weekend [1] - 37:18
weeks [3] - 4:25; 5:3; 50:12
whole [9] - 25:17; 32:11, 16; 50:11; 60:16; 67:10, 14; 68:11
wholly [1] - 75:12
willing [4] - 13:5; 71:18, 21; 76:9
win [1] - 44:2
wire [12] - 18:15; 45:24; 46:2; 63:4, 6, 9; 64:10, 16, 20
wired [1] - 19:12
wish [1] - 72:23
witness [41] - 8:21, 24; 9:1, 15, 17; 10:5, 17; 11:6; 12:21; 13:2, 6, 11; 16:24; 17:3, 8, 11, 17; 18:6; 20:3; 27:3; 28:25; 30:3; 31:8; 33:1; 34:8, 16-17; 36:22; 38:11, 13-14, 16; 44:17, 23; 45:3; 64:19; 67:16

witness's [1] - 33:3
witnessed [1] - 34:11
witnesses [4] - 8:21; 29:20; 35:12; 47:8
witnessing [1] - 12:23
words [2] - 27:23; 29:7
works [1] - 76:24
worry [1] - 25:21
wrapped [2] - 18:12; 29:16
Wright [5] - 25:11, 25; 32:6, 18; 70:1
Wright's [2] - 39:7; 70:1

**Y**

years [4] - 10:15; 27:5; 30:23; 31:1
yesterday [4] - 11:20; 35:23; 36:5; 37:8
YORK [2] - 1:1; 2:1
York [18] - 1:6; 16-17, 22; 2:2; 6:20; 10:3; 12:10; 13:4; 23:1; 24:4; 28:4; 42:18; 64:20, 23; 67:3; 75:23

**Z**

zero [2] - 14:14