1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,    :  09-CR-0003(CBA)
                             :
                             :
                             :
                             :  United States Courthouse
        -against-            :  Brooklyn, New York
                             :
                             :
                             :
                             :  Tuesday, February 9, 2010
DEWAYNE TAYLOR,              :  10:30 a.m.
                             :
            Defendant.       :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:    BENTON J. CAMPBELL, ESQ.
                       United States Attorney
                       Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                       BY: MATTHEW S. AMATRUDA, ESQ.
                           Assistant United States Attorney


For the Defendant:     LUCAS E. ANDINO, ESQ.
                       Attorney for the Defendant -
                       Dewayne Taylor
                         445 Park Avenue
                         9th Floor
                         New York, New York 10022

Court Reporter:  Anthony D. Frisolone, CSR, RDR, FCRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail:  Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Sentencing                                                  2

1          (In open court.)

2          (Defendant enters the courtroom.)

3          COURTROOM DEPUTY:  All rise, the United States

4  District Court for the Eastern District of New York is now in

5  session, the Honorable Carol Bagley Amon is now presiding.

6          (Honorable Carol Bagley Amon takes the bench.)

7          COURTROOM DEPUTY:  Calling criminal cause for

8  sentencing in Docket No. 09-CR-0003, *United States of America*

9  *against Dewayne Taylor*.

10          Counsel, please note your appearances for the

11  record.

12          MR. AMATRUDA:  For the United States of America,

13  Assistant United States Attorney Matthew S. Amatruda.

14          Good morning, Your Honor.

15          MR. ANDINO: Lucas E. Andino for Dewayne Taylor.

16          Good morning, Your Honor.

17          THE COURT:  Good morning.

18          Mr. Andino, did you have anything further to

19  add about any of the issues in light of the Government's

20  letter.

21          MR. ANDINO:  I have nothing to add to the letter,

22  Your Honor.  I did want to make a comment regarding the

23  Career Offender Guideline discussion we had the last time we

24  were here, and the comment I wanted to make was that both the

25  minimum sentence and the maximum of life that indicate the

Sentencing                                    3

1    guideline to which he gets assigned under the Career Offender

2    Guideline are based on the hundred-to-one disparity between

3    powder and crack cocaine.

4            THE COURT:  Only to the extent that -- not the

5    guideline disparity.  What you are referring to is a

6    statutory disparity.

7            MR. ANDINO:  Yes, Your Honor.  I did want to raise

8    that point, yes; that, if they were treated equally, it's not

9    a great improvement but he would be, his maximum as a

10   predicate would be 30 years which would then be under the

11   4B 1.1; the second, the category underneath of 37 would be

12   25 years or more, his offense level would be 34 which, at a

13   Criminal History VI, with be 262 to 327 months.

14           THE COURT:  How are you calculating that?

15           MR. ANDINO:  In the statute.

16           THE COURT:  I know but what amount of drugs?

17           MR. ANDINO:  Based on the amount of drugs in the

18   offense.  In other words 2B deals with 500 grams or more of a

19   mixture containing cocaine, and I'm going to sub-C of 21

20   U.S.C. 841(b)(1)(c).

21           THE COURT:  How many grams are you relying on?

22           MR. ANDINO:  The 122 grams that were involved in

23   the offense, the offense itself.  The actual offense of

24   conviction.

25           THE COURT:  How many grams?

```
                         Sentencing                        4
```

1            MR. ANDINO:  It's 122.

2            THE COURT:  All right.  So you get to a Level 34,

3    Criminal History Category VI.

4            MR. ANDINO:  Yes.

5            THE COURT:  And how do you arrive at that?

6            MR. ANDINO:  Because under 21 U.S.C. 841(b)(1)(c)

7    that would be the -- if the powder and crack cocaine were

8    treated equally, there would be no minimum sentence.  There

9    would be a maximum of 20 except if the person has been

10   sentenced to a term of -- a prior felony drug offense, the

11   term of imprisonment would be then not more than 30 years.

12   In other words, the maximum would then, instead of life be

13   30 years.

14           THE COURT:  What would be the mandatory minimum be?

15           MR. ANDINO:  There would be no mandatory minimum.

16           THE COURT:  With the second felony offender,

17   though, there would be no mandatory minimum.

18           MR. ANDINO:  Originally, it would be no more than

19   20 years, but if he had a prior drug felony it would be no

20   more than 30 years.

21           THE COURT:  How do you -- I'm still not sure how

22   you get to a guideline of 262 to 327.

23           MR. ANDINO:  Because under 4B 1.1.

24           THE COURT:  No.  The amount of drugs would be

25   122 grams, you're translating that to cocaine.  So, what

1    would that be?  How are you calculating it, just tell me.

2              MR. ANDINO:  I'm assuming a Career Offender

3    finding.

4              THE COURT:  Okay.

5              MR. ANDINO:  Under 4B 1.1(b), the maximum would be

6    25 years or more which is Level 34.

7              THE COURT:  Okay.

8              MR. ANDINO:  That's what I'm assuming.

9              THE COURT:  With no enhancements.

10             MR. ANDINO:  That's just the Career Offender.

11             THE COURT:  Wouldn't it be a Level 32 under your

12   analysis if it was 122 grams of cocaine?  An offense of

13   20 years or more.

14             MR. ANDINO:  What I'm saying, Your Honor, under the

15   guideline, 4B 1.1(b), where the statutory maximums are

16   discussed.

17             THE COURT:  Yes.

18             MR. ANDINO:  Under the statute, my understanding is

19   his maximum would be 30 instead of life.

20             THE COURT:  For 122 grams of cocaine?

21             MR. ANDINO:  Yes.

22             THE COURT:  Wouldn't it be 20?

23             MR. AMATRUDA:  I think, Judge, what Mr. Andino is

24   saying that ordinarily it would be 20 but the effect of a

25   prior felony information on a (b)(1)(c) count is not to

1    establish a mandatory minimum.  The fact is a zero minimum

2    stays, but it does it raises the maximum to 30 years.

3              THE COURT:  A prior felony offender does.

4              MR. AMATRUDA:  Correct.

5              THE COURT:  Okay.  I'm sorry, I didn't understand

6    that.

7              MR. ANDINO:  I wasn't more articulate.

8              THE COURT:  All right.

9              Is there anything else?

10             MR. ANDINO:  Your Honor, we had also in the -- we

11   didn't discuss it last time in the various submissions --

12   we've referred a number of times to the yield which I, you

13   know, we just didn't bring up.

14             I believe I've addressed that in the

15   submissions, in other words, the some of the estimates that

16   are proposed don't really take into account that there's a

17   reduction in yield if we're going to count it as crack

18   cocaine as opposed to powder.

19             And then the only other thing is the end of

20   our last submission, I see there was a letter regarding the

21   separation, most of which is blacked out, so there was a

22   letter about a co-defendant being separated or what I'm just

23   asking for at the end of our last submission was that if

24   unless there was some reason why there's a need for an

25   ongoing separation with Mr. Pughe, we'd like that Mr. Pughe,

Sentencing                                    7

1   Mr. Pughe's designation, wherever it is, not disqualify

2   Mr. Taylor from being someplace where his family can more

3   easily, you know, visit him than not.  So, I'd address that

4   at the end of our last submission, apparently there is an

5   ongoing separation.

6           THE COURT:  I don't think it's the policy of the

7   Bureau of Prisons to put co-conspirators in the same

8   institution or is there not a policy?

9           MR. AMATRUDA:  Normally, they follow, I believe,

10  the rule -- they follow the separation requests.  At least,

11  Judge, I don't know for a fact but I can tell the Court that

12  I frequently get questions about should so and so and so and

13  so be continued to be separated and those people who would

14  have been sent to their institutions.  So, I can only assume

15  that from that they may allow it put I don't know for sure.

16          THE COURT:  Is there any reason to keep a

17  separation order on file at this point in time?

18          MR. AMATRUDA:  Between?

19          THE COURT:  Mr. Taylor and Mr. Pughe.

20          MR. AMATRUDA:  Between Pughe and Taylor, no, Judge.

21          THE COURT:  If there is no reason to do it, maybe

22  you want to withdraw whatever.

23          MR. AMATRUDA:  I'll get a request from the Bureau

24  of Prisons whether they should continue to be separated, I

25  can tell them no.

1          THE COURT:  Does the Government want to further add

2    anything?

3          MR. AMATRUDA:  Just one sentence.  I would just

4    say, and I don't think there's really much agreement here,

5    because the court obviously knows other positions but the

6    defendant refers to obviously the offense of conviction being

7    122 grams of a substance as well as the yield for powder

8    cocaine that then gets developed into crack cocaine but it's

9    the offense of conviction is conspiracy.

10              So, obviously, it's not just 122 grams of

11   whatever substance you want and the same would go for the

12   question that, as far as it's pertinent here, of yield versus

13   not as the essence in the conspiracy is the agreement.

14          THE COURT:  As I understand the Government's --

15          MR. AMATRUDA:  That's all I have to say.

16          THE COURT:  As I understand the Government's

17   position, whether you call it part of the conspiracy or same

18   course of conduct with respect to Ms. Hiatt's testimony, that

19   her testimony established according to the Government, a half

20   a kilo of crack for a period of eight months; is that

21   correct.

22          MR. AMATRUDA:  Yes.

23          THE COURT:  A week.

24          MR. AMATRUDA:  My position hasn't changed from my

25   papers but I believe --

Sentencing                              9

1          THE COURT:  Isn't that your position with respect

2     to the 2006?

3          MR. AMATRUDA:  Let me double check so that I

4     don't -- that's right, Judge.

5          THE COURT:  And then there was crack that she

6     observed or he spoke about in the 2008 period which you're

7     saying is a maximum of about two kilograms, correct?

8          MR. AMATRUDA:  Judge, I think what I was saying was

9     seven kilograms either, you know, the conservative estimate

10    would be one kilogram for 2008 and the -- and I think that a

11    legitimate estimate is still and a conservative one would be

12    an additional seven kilograms which would represent kilogram

13    per month in 2008.

14         MR. ANDINO:  I'm sorry, I thought in 2008.

15         THE COURT:  How much for 2008.

16         MR. AMATRUDA:  Seven kilograms for the entire 2008.

17         MR. ANDINO:  From September to mid-November.

18         MR. AMATRUDA:  No, 2008.  January of 2008 to

19    November of 2008.

20         THE COURT:  I thought your conservative estimate

21    was two, I'm sorry about that.

22         MR. AMATRUDA:  I'm just looking at my December 16th

23    letter when I was reading from Page 6, the second full

24    paragraph.

25         THE COURT:  I thought your conservative calculation

1    was two kilos, the sum of two trips.  One kilo, the sum of

2    two trips.

3           MR. AMATRUDA:  I think they were both conservative

4    calculations, but I think what I was saying was that no --

5    assuming no trips happened in 2008 other than ones between

6    September and November that would be a kilogram.  But that's

7    assuming no trips between February of 2008 through September

8    of 2008.

9           THE COURT:  All right.  There are a number of

10   issues to resolve.  I think that there are, if I am correct,

11   there's an outstanding pro se motion for a new trial; is that

12   correct, Mr. Andino, you wanted that ruled on based on

13   conflict of interest --

14          MR. ANDINO:  Yes, Your Honor.

15          THE COURT:  -- that was being pressed by the

16   defendant pro se and I'm going to deny that motion.

17               My understanding of the factual basis for that

18   is that at some point in the past, the Federal Defenders

19   represented Darien Pughe fleetingly, as I recall, at an

20   arraignment in connection with an entirely unrelated matter.

21               That does not, in this Court's eyes, give rise

22   to an actual conflict and I don't think the circumstances

23   that have been presented that it rises even to a potential

24   conflict of interest.  So, to the extent that there is a

25   motion for a new trial that motion is denied.

Sentencing                          11

1           The next thing that the Court is required to

2    do procedurally is to determine what the training is in this

3    case.  The Court is not bound to follow that guideline range.

4    The only thing that completely ties the Court's hands in this

5    case is the mandatory minimum period of 20 years.  But

6    nonetheless procedurally the Court is required to determine

7    the guideline range.

8               First of all, that requires determining the

9    amount of crack cocaine involved in this offense and any

10   relevant conduct.  The Court went back and reviewed the

11   testimony of the trial witness, Lindsey Hiatt.  She testified

12   to occurrences were the Court to find them credible would

13   clearly be the same course of conduct as that is referred to

14   the guideline calculations.  She explained that the defendant

15   engaged in crack cocaine trafficking; it was similar in

16   method of operation.  He would come from New York to sell the

17   crack cocaine in Tennessee.

18              It was in a period of 2006 to a point in time

19   in 2008 in which he then went back to prison for 18-months

20   and then after that resumed dealing in crack cocaine.  This

21   was clearly the same course of conduct under 1B 1.3.

22              I found Ms. Hiatt's testimony to be credible,

23   I went back and reviewed that testimony.  It seems like the

24   2006 portion of her testimony conservatively, if I understand

25   the Government's position it would have been a half kilo of

```
                    Sentencing                    12
```

1    crack a month as opposed to a week; is that correct,

2    Mr. Amatruda?

3            MR. AMATRUDA:  I think that's right, Judge, because

4    as a conservative calculation --

5            THE COURT:  And we're talking about eight months?

6            MR. AMATRUDA:  For the 2006 period for?

7            THE COURT:  The 2006 period?

8            MR. AMATRUDA:  Yes, Judge.

9            THE COURT:  So, that would equal, for that period,

10   four kilos.

11           MR. AMATRUDA:  It was half a kilogram a month, let

12   me just.  Judge, just so Your Honor notes other position to

13   correct myself, we had, Your Honor, our calculation was one

14   half kilogram per week which would have been.

15           THE COURT:  That's what I thought you had said.

16           MR. AMATRUDA:  That's right, per week, which then

17   we had calculated as two kilograms per month which would then

18   amount to 16 kilograms and then we added to that we were

19   adding three or four kilograms that Ms. Hiatt saw in the

20   hotel room at the beginning of 2006.

21               So, that was the basis of our calculation.

22   And then, when I was referring to the other drugs, that my

23   estimate on Page 6 of my letter that I referred to took the

24   19 kilograms from 2006 and then added either, if you just

25   take September through November of 2008 conservatively one

Sentencing                                        13

1   kilogram during that entire period without counting any other

2   period during 2008 that's how I got to 20 kilograms.

3              And then if you expand that to include the

4   periods for all the periods from 2008, my estimate was

5   27 kilograms.

6              THE COURT:  Well, my view of it is this.  I think

7   that her testimony establishes repeated transactions in crack

8   cocaine for a period of time in 2006 and then some limited

9   additional observations in 2008.  The top base offense level

10  is 38 and that requires more than 4.5 kilograms of cocaine

11  base.  Based on Ms. Hiatt's testimony, there is clearly more

12  than 4.5 kilograms of cocaine base.  And so, that would take

13  us to a Level 38.

14             Now, there are other enhancements that have

15  been challenged that the Government seeks.  And the first of

16  those is for obstruction of justice.  And under a two-point

17  enhancement under 3C 1.1, I have reviewed the conversations

18  that were referenced in the Government's letter of December

19  16 and quoted therein.

20             It seems to me that they rather plainly show

21  that the defendant willfully obstructed or sought to impede

22  the administration of justice by making concerted efforts by

23  asking family members to place money into her account to

24  assure that Jessie Wright did not become a witness for the

25  Government.

1          I think what corroborates that is the proffer

2  earlier from Ms. Wright in which she said there were efforts

3  made by both Mr. Taylor and I think Mr. Pughe as well to have

4  her take all of the responsibility for the criminal conduct

5  that underlies their joint arrest.

6          In my view, seeking to persuade someone not to

7  testify constitutes obstructive conduct and I think that the

8  two points should be added to the offense level of 38.  The

9  Government has also sought a leadership role for Mr. Taylor;

10  that, in this Court's view, is less clear.

11          I'm prepared to accept in the relevant conduct

12  as well as in the circumstances of the offense that

13  Mr. Taylor might have been the one who was more important in

14  the overall transactions, but the fact that he was the one

15  responsible for obtaining the drugs and getting the drugs or

16  causing the drugs to be brought to New York doesn't

17  necessarily translate into any type of managerial role or

18  supervisory role.

19          It's not plain to me that he acted in the

20  transactions that have been set forth as anything greater

21  than the supplier of the drugs to other people.  So, I'm -- I

22  don't believe, on the facts that are before me, that I'm

23  satisfied that the Government has made out an aggravating

24  role.  That, I believe, if I'm correct, would make the

25  offense Level 40.

Sentencing                    15

1          Now, the operation of the Career Offender here

2    would come into play.  It is clear that the defendant here is

3    a career offender under 4B 1.2 based on his prior felony for

4    controlled substances offenses.  I think the ones referred to

5    in Paragraph 49 and Paragraphs 58 I was satisfied based on

6    the documentation presented by the Government last time that

7    with respect to the '93 conviction he was still on parole so

8    the timeliness was met.  There's no challenge to the

9    conviction set forth in Paragraph 58 so he is, without

10   question, it seems to be a Career Offender.

11         My understanding of the Career Offender

12   Guideline, and the parties can correct me if I'm wrong about

13   this, but I believe if his guideline is actually higher than

14   the Career Offender, it is the guideline that controls; is

15   that correct.

16         MR. AMATRUDA:  Yes, Judge.  So, at a Level 40,

17   Criminal History Category of VI, that would be 360-to-life.

18         MR. ANDINO:  Your Honor.

19         THE COURT:  Yes.

20         MR. ANDINO:  I don't know that it makes a

21   difference, but I believe that in the PSR, the Criminal

22   History Category was only VI because of the operation of the

23   Career Offender Guideline, so I believe it was.

24         THE COURT:  What would it have been?

25         MR. ANDINO:  I believe it was five.

```
                    Sentencing                    16
```

1          THE COURT:  Is that correct?

2          MR. LANIGAN:  That is correct, Your Honor.

3          THE COURT:  Okay.

4          MR. ANDINO:  It doesn't really change the guideline

5    range.

6          THE COURT:  It would still be 360-to-life on a 40,

7    Criminal History Category V.  The guidelines are the same and

8    the guidelines are the same if the Career Offender applied.

9    If the Level 37 applied it will still be the same because

10   that is also 360-to-life.

11         MR. AMATRUDA:  That's right, Judge.

12         THE COURT:  So, any way you analyze this, the

13   guideline range that the Court would find would be

14   360-to-life.  It's also apparent that as a guideline matter,

15   even if the cocaine were treated as -- if the crack were

16   treated as cocaine, he would still be at 360-to-life as a

17   result of the statutory requirement.

18              In other words, his original presentence

19   report which only held him accountable for the 122 grams,

20   that's a separate matter.  If we went with his original

21   presentence report, and he was only held accountable for

22   122 grams, under the guidelines it would still be

23   360-to-life.  That was his original guideline range only

24   holding him accountable for the small amount of crack.

25         MR. ANDINO:  Can I just have a moment, Your Honor?

Sentencing                                    17

1           THE COURT:  I'm pretty sure, that's correct.

2           MR. AMATRUDA:  Judge, that would be based on the

3    Career Offender finding.

4           THE COURT:  Based on the Career Offender.

5           MR. AMATRUDA:  Based on the Career Offender and the

6    statute of conviction.

7           THE COURT:  Right.

8           MR. ANDINO:  In other words, what Your Honor just

9    said is based on Career Offender.

10          THE COURT:  Right.  Okay.

11              Now, so the disparity within the guidelines,

12   this is getting a little hypertechnical, but the disparity

13   within the guidelines as to the way the guidelines treat

14   crack versus cocaine doesn't result, really, in a different

15   guideline sentence because, as a result of the statute, not

16   the guidelines, he would face, in any event, a Level 37 which

17   would be 360-to-life.

18              I think the only analysis, the analysis that

19   you made this morning, Mr. Andino, would have been, let's

20   say, that we didn't have a statutory issue.  He would have

21   been at a Level 34 under the Career Offender and I think two

22   points would have been, well, let's say, he was just at a

23   Level 34, that would have been Criminal History Category VI

24   would have been 262-to-327.

25              Is that what you had calculated?

```
                         Sentencing                    18
```

1        MR. ANDINO:  That's what I had argued under the

2   one-to-one ratio on the offense.

3        MR. AMATRUDA:  And just, again, I don't know if

4   this is important or not, but that's based on no finding of

5   relevant conduct.  That's just the seized amount of cocaine,

6   correct?

7             And the fact that we, in other words, it's

8   a -- as the defense poses it, means that there was only

9   122 grams seized, there was no relevant conduct, and we did

10  not pursue a count that was higher than the (b)(1)(c).

11            So, I guess, I have no disagreement with it if

12  that's the case or if even the 122 grams seized plus relevant

13  conduct.  If we had not sought a higher count of conviction

14  then, that would be correct, the defense would be correct.

15        THE COURT:  Okay.  All right.

16            Do you want to be heard further now that we've

17  calculated the guidelines with respect to Mr. Taylor?

18        MR. ANDINO:  You're asking me, Your Honor?

19        THE COURT:  Yes.  Did you want to say anything

20  further?

21        MR. ANDINO:  I made my argument the last time and

22  whatever arguments I thought I would just like to say that I

23  think that Your Honor probably sees and sentences people

24  whose conduct is, I think, substantially worse than

25  Mr. Taylor.

Sentencing                                19

1           I understand Mr. Taylor has been convicted

2    here of dealing crack cocaine which is not a trivial thing

3    and I understand what the guidelines here are doing in terms

4    of criminal history.

5                 As I said before, Mr. Taylor's modus in this

6    case was devoid of any allegation of violence.  The

7    sentencing guidelines, to the extent that the Commission does

8    empirical studies, periodical empirical study, the crack

9    cocaine universe is found to be violent, to be more violent

10   than the powder cocaine universe.

11          I'm sure if there had been any hint at

12   violence in Mr. Taylor's modus we would have heard about it

13   at length.  And I do think that Mr. Taylor, notwithstanding

14   everything that's been said, notwithstanding the fact that he

15   switched cars to travel or whatever is essentially -- not a

16   big-time crack dealer.  And we're talking about the

17   difference between him being in jail until his mid-60s and

18   him being in jail until his mid-70s, and I do believe that a

19   sentence closer to the statutory minimum or at the statutory

20   minimum would certainly achieve all the purposes that the

21   guidelines want us to achieve and would immobilize and

22   confine Mr. Taylor until well beyond any time where he is

23   going to be any threat again to engage in any kind of drug

24   dealing.  I've said it before in my papers but I would like

25   to repeat it.

```
                        Sentencing                        20
```

1      THE COURT:  Does the Government want to add

2   anything further before I hear from Mr. Taylor.

3      MR. AMATRUDA:  No thank you, Judge.  To the extent

4   that I had disagreements with the defense including what I

5   just said, I think that's been referred to has all been

6   address.

7           Thank you.

8      THE COURT:  Do you want to say anything before the

9   Court imposes sentence, Mr. Taylor.

10     THE DEFENDANT:  Your Honor, I don't know what else

11  to say but I appreciate Mr. Andino a lot.  He got to know me

12  very well and I'm glad that he took time out with me.

13          But, I am being sentenced now through the

14  testimony of Ms. Hiatt; and the testimony of Ms. Hiatt wasn't

15  all true, Your Honor, it really wasn't.  I never met her.  We

16  met in January, she says it in her testimony, when she met me

17  is when the car incident happened which was in June.

18          I just got released from Rikers Island in

19  January, I was nowhere near Tennessee then.  She make these

20  accusations up, Your Honor, because she's speaking because

21  she doesn't want to be prosecuted.

22          The longest I knew Ms. Hiatt in 2006, Your

23  Honor, was probably roughly about two and a half months of

24  the we never met.

25          And, Your Honor, when I got on that phone and

```
                        Sentencing                    21
```

1    I was talking about Ms. Wright, I didn't try to bribe her.  I

2    was worried that when she came home on bail, family members

3    were saying that she was setting me up.  Family members

4    saying she was testifying against me.  I got pissed off on

5    the phone.  I don't know, God.  It's just the phone

6    conversation didn't make me look as bad as I was trying to,

7    Your Honor, which I was not I was just trying to help

8    Ms. Wright, Your Honor.

9              I really can't speak because my lawyer told me

10   not to really go back into the case, whatever, but I just

11   would hope that, you know... I forever glorified my past

12   tense life that was something I never tried to make it seem

13   like what I'm doing is the right thing.

14             And last time I was here on January 20th,

15   Mr. Amatruda said I never tried.  I tried my hardest to try

16   to seek employment.  I really did.  God knows that my mother

17   is here, she will even tell you that.  I tried my hardest.  I

18   don't think it was right for me to make the choice to go back

19   to the streets, it wasn't.  But can't nobody sit here and say

20   what I didn't try to do.  I can go on about myself but I

21   don't know what -- I really don't know what to say right now,

22   but I hope that, you know, whatever decision you make I guess

23   I'll just have to go by what decision you make, Your Honor.

24             Thank you.

25             THE COURT:  All right.  Well, we -- I have

Sentencing                                        22

1    calculated a guideline range here which, giving the defendant

2    the full benefit of most of his arguments, still remains

3    360-to-life which, of course, is an extremely high guideline.

4                 The Court has to take that guideline into

5    account in determining what the appropriate sentence is.

6    Ultimately, the Court is called upon to impose a sentence

7    that's sufficient but not greater than necessary to comply

8    with certain sentencing factors that are set forth in

9    §3553(a) of Title 18 and those include the need for the

10   sentence imposed to reflect the seriousness of the offense

11   and this offense, as everyone knows, and as we've discussed

12   here, is a very serious one.

13                 It involves the distribution of crack cocaine.

14   This is not the first time that the defendant has been

15   convicted of that activity.  I think he had the prior case

16   from Tennessee, if my recollection serves me correct, was

17   involved crack cocaine.

18                 Even if one were not to consider the testimony

19   of Ms. Hiatt, it is plain, based on the convictions alone

20   that the defendant has been engaged in crack cocaine dealing

21   for a period of time.

22                 The sentence has to promote respect for the

23   law and to provide just punishment for the offense and to

24   afford adequate deterrence to criminal conduct, and I think

25   that deterrence is a consideration in this particular case,

Sentencing                                          23

1   specific deterrence in light of the fact that Mr. Taylor,

2   having gotten out of prison after having been convicted of a

3   crack cocaine offense resumed again involving himself in

4   crack dealing then had a violation of supervised release.

5   And even after being released from that, apparently learned

6   nothing from the experience because he once again began

7   engaging in crack cocaine dealing.  And there is certainly

8   the sentence here has to afford specific deterrence to

9   Mr. Taylor and his documented propensity to continue to

10  engage in crack cocaine dealing.

11              The Court has to consider the nature and

12  circumstances of the offenses and, again, I found the

13  testimony of Ms. Hiatt to be credible.  But even putting that

14  aside, or even not considering that the circumstances of the

15  individual arrest were a significant serious offense

16  involving 122 grams of crack cocaine, specifically, or

17  especially in light of his prior dealings.

18              In looking at the history and characteristics

19  of the defendant.  I think despite what I think are the

20  considerable advocacy skills of Mr. Andino, unfortunately,

21  there is not much positive to say about the defendant.  He

22  apparently has chosen to live the majority of his life

23  committing crimes.  He was, as I've mentioned before, an

24  incorrigible crack dealer when released from one offense he

25  almost immediately was back on the street selling crack.

Sentencing                          24

1              Counsel pointed out on his behalf that he

2    stopped at one point selling heroin because of its

3    devastating impact but that would cause the Court to wonder

4    if he ever took the time to observe some of his

5    crack-addicted clients.

6              His record in prison is problematic.  There

7    were a number of incidents and violations while in prison.

8    He had infractions for being insolent to the staff possessing

9    dangerous weapons, stealing, and assaultive conduct.

10             So, the history and characteristics here are

11   not favorable.  The sentence here, though, the guideline

12   sentence of 30 years, even with for someone with Mr. Taylor's

13   background, in this Court's view, is excessive in light of a

14   couple of factors.

15             I think sentences such as that are appropriate

16   in some cases, cases where weapons are involved where

17   violence is involved.  I think a sentence in that

18   neighborhood might well be justified.  There was, in his

19   recent criminal history, and certainly in connection with the

20   offense, no evidence of any weapons or violence.

21             Perhaps the more appropriate consideration is

22   concerns about both his age and his health.  He is, I

23   believe, now 45 years old.  He has diabetes.  I think that

24   these are considerations which result in a shortened life

25   expectancy.

Sentencing                                25

1           Although Mr. Taylor's conduct was certainly

2   significant criminal conduct, I don't think that it justifies

3   what in effect would be a life sentence for him as serious as

4   the conduct undoubtedly is.

5               Having considered the guidelines and

6   considered the factors in §3553(a), I'm going to sentence

7   Mr. Taylor to the custody of the Bureau of Prisons for a

8   period of 270 months to be followed by a five-year term of

9   supervised release.

10              I'll impose a hundred dollar special

11  assessment; I won't further impose a fine.  It doesn't appear

12  that he has any ability to pay a fine.

13              Mr. Taylor, you have a right to appeal your

14  sentence.  Any Notice of Appeal has to be filed within

15  14 days of the Court's judgment.

16              Do you understand that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Is there anything further that we need

19  to take up?  Do you want a recommendation that he sentenced

20  to a facility closer to the Northeast area?

21          THE DEFENDANT:  I wanted to ask if you could put in

22  a recommendation that I be placed closer to home because my

23  mother is ill.

24          THE COURT:  Home is New York?

25          THE WITNESS:  New York, yes.

1           THE COURT:  I'll make that recommendation.

2           THE WITNESS:  Thank you.

3           THE COURT:  And you're going to void the separation

4     order, correct?

5           MR. AMATRUDA:  I'm not going to void -- there's no

6     separation order.  If I'm asked, as I said before --

7           THE COURT:  I thought there was an order.

8           MR. AMATRUDA:  The way I understand it, Judge, is

9     that I request that certain prisoners separated.  As I

10    explained earlier, the Bureau of Prisons contacts me from

11    time to time and asks me whether prisoners who then passed on

12    to their institution where they've been assigned should

13    continue to be separated, and in that instance, what I said I

14    would do is tell them that I didn't see any reason why I feel

15    they should be continue to be separated.

16          THE COURT:  There's nothing extant?

17          MR. AMATRUDA:  Yes, there is.  It's just not an

18    order, I don't think Your Honor ordered anything.

19          THE COURT:  Whatever you have to do to lift that,

20    can you to that?

21          MR. AMATRUDA:  Yes.

22          THE COURT:  Okay.  Anything else?

23          MR. ANDINO:  No.

24          MR. AMATRUDA:  No.

25          THE COURT:  Okay.

Sentencing                                          27

1          MR. ANDINO:  Your Honor, if I may?

2              When I agreed to this, I know the marshals

3    don't like it, but when I agreed to today's adjourn date it

4    slipped my mind that Tuesday is when he receives his family

5    visits and I was just going to ask if he can speak briefly to

6    his family.  I know the Court doesn't like that.

7          THE COURT:  I'm really sorry and I'm sorry about

8    the problem with the adjourn date but it causes security

9    issues for the marshals and I don't want to put them in that

10   position.

11             (Defendant exits from courtroom.)

12             (WHEREUPON, the proceedings were adjourned.)

13                        *   *   *

14              <u>CERTIFICATE OF REPORTER</u>

15      I certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter.

16

17

18

     _____
19   Anthony D. Frisolone, CSR, RDR, CRR, CRI
     Official Court Reporter
20

21

22

23

24

25